USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___8/27/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WHITE PLAINS HOUSING AUTHORITY,

                              Plaintiff,

    -against-

BP PRODUCTS NORTH AMERICA INC.,
MARIANINA OIL CORP., and ATLANTIC
RICHFIELD COMPANY,

                              Defendants.

17-cv-6250 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff White Plains Housing Authority ("Plaintiff" or "WPHA") brings this action against Marianina Oil Corporation ("Defendant" or "Marianina"),[1] asserting claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the New York Navigation Law ("NYNL"), N.Y. Nav. Law § 181(5).[2]  (ECF No. 59.)  Plaintiff also asserts state common law claims for negligence, private nuisance, and trespass.  (*Id.*)  Plaintiff alleges that its property was contaminated by discharges of gasoline and toxic-biproducts of gasoline emanating from a former gasoline station at 34 East Post Road, White Plains, New York (the "Service Station"), which is currently owned, and was formerly operated, by Defendant.  (*Id.*)

Before the Court is Plaintiff's motion for summary judgment on the issue of liability.  (ECF No. 103.)  For the following reasons, Plaintiff's motion is GRANTED.

---

[1]     By Stipulation and Order, dated November 19, 2019, Plaintiff's claims against Defendants BP Products North America, Inc., and Atlantic Richfield Company were dismissed with prejudice.  (ECF No. 98.)

[2]     Upon commencing this action, Plaintiff filed a "Related Case Statement," which indicated that this action is related to another action before this Court: *White Plains Housing Authority v. Getty Properties Corporation et al.*, 13-cv-6282 (NSR) (JCM) (the "Getty Action").  By Stipulation and Order, dated November 30, 2017, all remaining claims and crossclaims in the Getty Action were voluntarily dismissed.

## BACKGROUND

### I.   Materials Considered by the Court

### A.   Defendant's Failure to Comply with Local Rule 56.1

Plaintiff argues that this Court should deem as undisputed the facts in its Local Civil Rule 56.1 Statement.  (Pl. Reply in Further Supp. of Mot. for Summ. J. ("Reply"), ECF No. 108, at 4.) The Court agrees.   Local Civil Rule 56.1 provides that "[u]pon any motion for summary judgment," the moving party shall annex "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."   Local Civil Rule 56.1(a).   The party opposing the motion is then to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts."   *Id.* 56.1(b).   "Each statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."   *Id.* 56.1(d).  If the opposing party fails to submit a responsive statement, then the facts set forth in the moving party's 56.1 statement are deemed admitted.   *Id.* 56.1(c); *see Cress v. Wilson*, No. 06 Civ. 2717(JGK), 2008 WL 5397580, at *5 (S.D.N.Y. Dec. 29, 2008) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).

Here, Plaintiff filed a Statement of Undisputed Facts and accompanying declarations and exhibits as required under Local Rule 56.1.  (*See* Pl. 56.1 Statement of Undisputed Facts ("Pl. 56.1"), ECF No. 106.)  Defendant, in response, failed to submit any responsive statement, and, in fact, did not file an opposition to Plaintiff's motion.   Instead, Defendant, who is represented by counsel, submitted a three-page affirmation signed by Defendant's president, Frank Codella (the

"Codella Affirmation").  (ECF No. 107.)[3]  Because Defendant failed to comply with Local Rule 56.1, the Court will deem as admitted those facts set forth in Plaintiff's 56.1 Statement, to the extent they are supported by the record.

### B. Plaintiff's Request to Preclude Portions of the Codella Affirmation

Plaintiff contends that, under Rule 37(c) of the Federal Rules of Civil Procedure, paragraphs 13, 14, and 16 of the Codella Affirmation should be stricken from the record because the facts therein had not been previously disclosed under Rule 26(e).  (Reply 4-5.)  In any event, Plaintiff maintains, the Codella Affirmation does not dispute any material fact in Plaintiff's moving papers.  (*Id.* at 3.)

Under Rule 26(e) of the Federal Rules of Civil Procedure, a party "who has responded to a[] . . . request for production" must "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  Here, Defendant apparently did not previously disclose the facts regarding the City of White Plains' stop work order until it "opposed" Plaintiff's motion for summary judgment.  Such a failure to disclose is a clear violation of Rule 26(e).  *See Xiao Hong Zheng v. Perfect Team Corp.*, 739 F. App'x 658, 662 (2d Cir. 2018).  The question then is whether preclusion of the new factual assertions is warranted.  The Court concludes that it is.

If a party fails to provide information required under Rule 26(e), it may not "use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified" or was harmless.  Fed. R. Civ. P. 37(c)(1).  The decision of whether to apply this "drastic remedy" is up to the discretion of the court.  *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).

---

[3]        The affirmation was also docketed at ECF No. 111.

In evaluating whether to preclude evidence, courts will look to "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of . . . the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance." *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 (AJN), 2015 WL 1402049, at *22 (S.D.N.Y. Mar. 25, 2015) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

A review of these factors reveals why preclusion is warranted.  To begin, Defendant provided no explanation for why this information is being provided for the first time in opposition to Plaintiff's motion.  Meanwhile, although the factual assertions are not of great importance—they do not even seem to raise a triable issue of fact—the prejudice to Plaintiff appears readily apparent.  Plaintiff was forced to file Freedom of Information Law requests to investigate and respond to these previously undisclosed factual assertions in the middle of briefing its motion. (*See* Reply Aff. of Norman W. Bernstein in Supp. of Pl.'s Mot. for Summ. J. ("Bernstein Reply Aff."), ECF No. 109, Ex. 3.)  Finally, with discovery closed, continuance appears to be unfeasible. Therefore, in resolving Plaintiff's motion, the Court will not consider paragraphs 13, 14, and 16 of the Codella Affirmation.  *See Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008) (excluding an expert's declaration and testimony because plaintiff provided no explanation for its failure to supplement the expert disclosure under Rule 26(e), the information was not of great importance, the filing was prejudicial, and continuance would have been impracticable); *see also Madden v. Town of Hempstead*, No. 16-CV-6835(SJF)(AKT), 2019 WL 1439935, at *12 (E.D.N.Y. Mar. 29, 2019) (precluding affidavit of a witness who was not previously identified under Rule 26 because plaintiff had "not offered any explanation . . . for her failure to identify" the witness, the affidavit was cumulative and would not affect the court's

determination of the motion, the defendants would be prejudiced by the lack of an opportunity to depose the witness, and the action was at the summary judgment stage).

## C. Defendant's Failure to File an Answer to the Second Amended Complaint

The operative complaint in this matter is Plaintiff's Second Amended Complaint, which was filed on November 30, 2018.  (ECF No. 60.)  Although it filed an answer to Plaintiff's First Amended Complaint (*see* ECF No. 23), Defendant did not file an answer to the Second Amended Complaint.  Plaintiff now requests that the Court conclude that Defendant has admitted all well-pleaded claims in the Second Amended Complaint.  (Pl. Mem. of Law in Supp. of Mot. for Summ. J. ("Mot."), ECF No. 105, at 14.)

A review of the Second Amended Complaint reveals that Plaintiff largely just added claims and allegations against the new defendant, Atlantic Richfield Company.  In doing so, Plaintiff did not meaningfully alter the allegations to which Defendant had previously answered.[4]  Given that Defendant has essentially responded to the current allegations against it, the Court will construe Defendant's Answer to the First Amended Complaint as responding to the Second Amended Complaint.  *See, e.g.*, *CIT Bank, N.A. v. Vasquez*, No. 17-CV-4654 (MKB)(PK), 2019 WL 4418883, at *1 n.2 (E.D.N.Y. Aug. 19, 2019), *adopted by*, 2019 WL 4415291 (E.D.N.Y. Sept. 16, 2019) (construing answer to initial complaint as an answer to amended complaint where amended complaint only made clerical corrections and plaintiff did not seek default judgment).

## II. Factual Background

The following facts are derived from Plaintiff's Rule 56.1 Statement and a review of the record.  As noted above, they have been deemed uncontested unless otherwise noted.

---

[4]     The new allegations in the Second Amended Complaint were delineated by the letters "AR" affixed to a number.  (*See, e.g.*, ECF No. 60 ¶ 3AR (alleging that "Defendant ARCO is a domestic corporation organized and existing under the laws of the State of Delaware").)

### A.  The Parties and the Service Station

####    i.  *WPHA*

WPHA is a municipal public housing authority that exists under the laws of New York. (Pl. 56.1 ⁋ 1; Aff. of Norman W. Bernstein ("Bernstein Aff."), ECF No. 106, Ex. 2.)  Since 1949, WPHA has owned and operated a multi-family residential public housing complex known as the Winbrook Apartments, which is in downtown White Plains, New York.  (Pl. 56.1 ⁋ 2; Bernstein Aff. Ex. 1 ("Carter Dep. Tr.") at 29:7-32:3.)  The Winbrook Apartments contain five apartment buildings, located at (1) 159 S. Lexington Avenue, (2) 135 S. Lexington Avenue, (3) 11 Fisher Court, (4) 33 Fischer Court ("Building 33"),[5] and (5) 225 Dr. Martin Luther King Jr. Blvd.  (Pl. 56.1 ⁋ 3; Carter Dep. Tr. at 30:23-32:3; Bernstein Aff. Ex. 3 ⁋ 1.)

####    ii.  *Marianina*

Marianina is a domestic corporation, which was formed under the laws of the State of New York.  (Pl. 56.1 ⁋ 6.)  Mr. Frank Codella ("Codella") is Marianina's owner and serves as its President.  (*Id.* ⁋ 7; Bernstein Aff. Ex. 7 ⁋ 1; *id.* Ex. 8 ("Codella Dep. Tr.") at 20:6-20:16.)  The corporation was formed in 1986 for the purpose of purchasing the Service Station.  (Pl. 56.1 ⁋ 8; Bernstein Aff. Ex. 7 ⁋ 1.)  Since June 24, 1987, Marianina has been the owner and/or operator of the Service Station.  (Pl. 56. 1 ⁋ 9; Bernstein Aff. Ex. 7 ⁋ 1.)

####    iii.  *Proximity Between WPHA's Property and Marianina*

WPHA's parking lot and Building 33 are directly adjacent to, and to the north/northwest of, the Service Station.  (Pl. 56.1 ⁋ 11; Carter Dep. Tr. 219:18-24; Bernstein Aff. Ex. 10 ⁋ 31.)  Similarly, the distance between the Service Station's property line and Building 33 is approximately 200 feet.  (Pl. 56.1 ⁋ 12; Carter Dep. Tr. at 219:18-220:12; Bernstein Aff. Ex. 10 ⁋

---

[5]     Approximately 350 people, including elderly individuals and children, live in Building 33.  (Pl. 56.1 ⁋ 5; Bernstein Aff. Ex. 4 at 2.)

29 & figs. 1 & 8.)  Building 33 is in plain view from the Service Station.  (Pl. 56.1 ⁋ 13; Bernstein Aff. Ex. 13 ("Papitto Dep. Tr.") at 93:22-94:1.)

The north/northwest location of WPHA's property is on a down gradient from the Service Station.  (*See* Bernstein Aff. Ex. 11 ("Bendell II Dep. Tr.") at 275:11-16.)  Thus, the groundwater flow direction under the Service Station is to the north and/or northwest.  (Pl. 56.1 ⁋ 10; Bernstein Aff. Ex. 9 ("Talimcioglu I Dep. Tr.") at 116:13-23; *id.* Ex. 10 ⁋ 32 & fig. 8.)

iv.    *The Service Station*

The Service Station was built as Sinclair Gasoline Station by the predecessors of BP Products North America Inc. in or about 1937.[6]  (Pl. 56.1 ⁋ 14; Bernstein Aff. Ex. 14 ("Reinhart Dep. Tr.") at 9:22-12:17.)  Decades later, in or about 1978, four new single hull steel underground storage tanks ("USTs") were installed at the Service Station.  (Pl. 56.1 ⁋ 15; Reinhart Dep. Tr. 41:24-46:5.)  These USTs had no drip pans, spill buckets, catch basins, or containment sumps under the pumps.  (Pl. 56.1 ⁋ 15; Codella Dep. Tr. at 40:15-41:3, 206:7-208:12; Papitto Dep. Tr. at 57:23-58:13; Reinhart Dep. Tr. at 30:7-23.)  Critically, as testified to by Daniel Bendell, the New York Department of Environmental Conservation ("NYSDEC") Regional Spill Engineer overseeing the Service Station, the lack of spill bucket was notable because gasoline spills "would go onto the ground" in their absence (Pl. 56.1 ⁋ 19; Bernstein Aff. Ex. 16 ("Bendell I Dep. Tr.") at 63:5-10.)

As part of the 1978 UST installation, pipes and conduits were also installed.  These pipes and conduits were made of standard galvanized steel and lacked cathodic protection. (Pl. 56.1 ⁋ 16; Talimcioglu I Dep. Tr. at 304:11-305:23; Reinhart Dep. Tr. at 32:6-32:13; *see also* Bernstein Aff. Ex. 15 ("Castellano Dep. Tr.") at 45:24-46:5.)

---

[6]    BP had acquired the property on March 4, 1969 from Atlantic Richfield Company, who had merged with Sinclair.  (Reinhart Dep. Tr. at 9:25-10:6, 11:18-12:14.)

### B.  History of Contamination at the Service Station

#### i.  Marianina's Initial Inspection of the Service Station

Marianina purchased the Service Station on or about June 24, 1987.  (Bernstein Aff. Ex. 7 ¶ 1; *see also* Codella Dep. Tr. at 22:10-13.)   To obtain a mortgage to purchase the station, Marianina had to conduct a tank test and a line test.  (Codella Dep. Tr. at 22:14-23:12.)  Codella testified that the tank tests were to check for any leaks, while the line tests were to check the feed lines into the tank.  (*Id.* at 23:3-12.)  Marianina, however, did not obtain any information about the soils, groundwater, or any other environmental conditions at the Service Station.  (Pl. 56.1 ¶ 20; Codella Dep. Tr. at 23:15-24.)

From approximately 1987 to 1994, Marianina operated the Service Station.  (Pl. 56.1 ¶ 22; Codella Dep. Tr. at 28:15-17.)   During this period, the Service Station lacked any containment devices under its tanks and did not have any leak detection or overfill protection.  (Pl. 56.1 ¶ 23; Codella Dep. Tr. at 39:15-41:3, 206:7-208:12.)   As a result, every time the Service Station had received fuel deliveries, "there [was] always spillage" that "went into the ground."  (Pl. 56.1 ¶ 24; Codella Dep. Tr. 39:22-40:7, 66:15-67:3.)

#### ii.  The 1994 Excavation, Removal, and Replacement of the Service Station's USTs

In 1994, Marianina determined that the Service Station's USTs had to be changed due to their age.  (Codella Dep. Tr. 28:18-20.)  Thus, in or around August or September 1994, Codella retained Papitto Construction Co. ("Papitto Construction") to excavate, remove, and replace the USTs.[7]  (Pl. 56.1 ¶ 25; Codella Dep. Tr. 30:9-14; Papitto Dep. Tr. at 19:6-21:20: Bernstein Aff. Ex. 17.)  Specifically, as stated in the parties' contract, Papitto Construction was to remove the four existing steel tanks and replace them with two 10,000-gallon underground double wall

---

[7]       The contract was officially signed on September 20, 2014.  (Bernstein Aff. Ex. 17 at 2.)

fiberglass tanks and one 6,000-gallon underground double wall fiberglass tank.  (Bernstein Aff. Ex. 17 at 1.)  Papitto Construction then, via letter, notified NYSDEC of its intention to undertake this project on April 8, 1995.  (Pl. 56.1 ¶ 26; Papitto Dep. Tr. at 104:25-107:9; Bernstein Aff. Ex. 18.)  The purpose of the letter was to inform NYSDEC that Codella and Marianina were complying with the state's new regulations by replacing the USTs.  (Papitto Dep. Tr. at 107:4-7.)

As the project began, Marianina retained P.W. Grosser Consulting Engineer and Hydrologist, P.C. ("P.W. Grosser") to perform environmental consulting.  (Pl. 56.1 ¶ 27.)  P.W. Grosser's consulting work included oversight of test pits, collection and analysis of samples, oversight of the UST removal, and endpoint sampling.  (*Id.*; Castellano Dep. Tr. at 16:17-19:24, 69:14-17, 80:4-9, 83:6-14; Bernstein Aff. Ex. 19 ("P.W. Grosser Report") at BPPL004495-4502; *id.* Ex. 20.)

On August 16, 1994, Papitto Construction drilled four test pits to characterize the soil quality around the existing tank pad.  (Castellano Dep. Tr. at 39:6-15; P.W. Grosser Report at BPPL004497-98.)  A total of four test pits were created using a backhoe, and during the testing, soils and ambient air were monitored for the presence of volatile organic compounds ("VOCs").  (P.W. Grosser Report at BPPL004497-98.)  During the testing, P.W. Grosser observed, in several test pits, product that was eight feet below grade and floating on the water table.  (Pl. 56.1 ¶ 29; Castellano Dep. Tr. at 29:18-30:11, Bernstein Aff. Ex. 21 at BPPL004639-41; P.W. Grosser Report at BPPL004499.)  P.W. Grosser also observed strong odor on the soil samples and elevated photoionization detector ("PID") readings at three of the test pits.  (Pl. 56.1 ¶ 30; Castellano Dep. Tr. at 46:13-47:21; Bernstein Aff. Ex. 21 at BPPL004639; P.W. Grosser Report at BPPL004499.)  Based on these observations, P.W. Grosser reported a gasoline spill to the NYSDEC on August 17, 1994, and the site was subsequently assigned NYSDEC Spill No. 94-06684.  (Pl. 56.1 ¶ 31;

Castellano Dep. Tr. at 46:13-47:23; P.W. Grosser Report at BPPL004495, BPPL004498; Bernstein Aff. Ex. 23.)

Papitto Construction went on to remove a total of 1,601.11 tons of petroleum contaminated soil as part of the site excavation.  (Pl. 56.1 ❡ 33; Papitto Dep. Tr. at 28:10-25.)   During the excavation process, P.W. Grosser observed stained soils and elevated PID readings above and below the four USTs.  (Pl. 56.1 ❡ 32; Castellano Dep. Tr. at 185:23-186:20; P.W. Grosser Report at BPPL004500.)  However, as revealed by P.W. Grosser's drawings, the excavation only involved the portion of the Service Station that was in the immediate vicinity of the USTs.  (Pl. 56.1 ❡ 34; Bernstein Aff. Ex. 20; *see also* Castellano Dep. Tr. at 118:13-17; Bernstein Aff. Ex. 21 at BPPL004642, BPPL004651, BPPL004655.)  And, in some areas, the excavation was only 3-4 feet deep.  (Pl. 56.1 ❡ 35; Codella Dep. Tr. at 311:10-314:3.)  Moreover, as testimony made clear, only the soil within the area of excavation was remediated.  (Pl. 56.1 ❡ 36; Codella Dep. Tr. 78:18-80:14.)  No groundwater remediation was performed during the replacement project.  (Pl. 56.1 ❡ 41; Papitto Dep. Tr. at 68:6-71:6; Castellano Dep. Tr. at 194:7-15.)  This resulted in substantial contamination being left behind.  (Pl. 56.1 ❡ 34; Castellano Dep. Tr. at 235:2-240:23.)

On October 12 and 19, 1994, P.W. Grosser collected eight endpoint soil samples at the perimeter of the excavation to confirm the conditions of the soil left behind.  (Pl. 56.1 ❡ 37; Castellano Dep. Tr. at 151:14-152:25; P.W. Grosser Report at BPPL004501-02.)  The endpoint analysis indicated that gasoline contaminated soil still remained at the Service Station at several locations, including the northern portion of the excavation near Building 33's parking lot.[8]

---

[8]     Specifically, the soil at Endpoint #4 contained 460 parts per billion ("ppb") xylenes (against a NYSDEC soil cleanup standard of 100 ppb), 130 ppb 1,3,5-trimethylbenzene (against a NYSDEC soil cleanup standard of 100 ppb), and 410 ppb 1,2,4-trimethylbenzene (against a NYSDEC soil clean up standard of 100 ppb).  (Pl. 56.1 ❡ 39; Castellano Dep. Tr. at 240:10-20; P.W. Grosser Report at BPL004503.)  Endpoints #1 and #8 also showed evidence of remaining gasoline contamination.  (Pl. 56.1 ❡ 40; P.W. Grosser Report at BPPL004503.)

(Pl. 56.1 ⁋⁋ 38-39; Castellano Dep. Tr. at 193:8-194:2, 223:24-224:15, 239:24-240:23; P.W. Grosser Report at BPPL004502-03.) Despite these findings, neither soil nor groundwater samples were taken from outside of the excavation area to check for contamination. (Castellano Dep. Tr. at 118:7-12.)

### iii.    Marianina Leases the Service Station

Upon completion of the tank replacement project, Marianina leased the Service Station to Barrier Oil Corporation ("Barrier"). (Pl. 56.1 ⁋ 42; Codella Dep. Tr. at 27:5-28:5; Bernstein Aff. Ex. 22 ⁋ 31.) Barrier operated the Service Station for approximately five years between 1995 and 2000. (Pl. 56.1 ⁋ 43; Codella Dep. Tr. at 27:14-16; Bernstein Aff. Ex. 22 ⁋ 31.) After the Barrier lease ended, Marianina leased the Service Station to 34 Post Rd. Gasmart, Inc. ("Gasmart") from approximately 2007 to 2017. (Pl. 56.1 ⁋ 44; Bernstein Aff Ex. 22 ⁋ 33; *id.* Ex. 24 ("Ibrahim Dep. Tr.") at 15:17-17:21, 28:24-30:8.)

During this timeframe, Gasmart operated the Service Station. (Pl. 56.1 ⁋ 45.) Pursuant to the lease, however, Marianina was responsible for maintaining the Service Station's USTs, underground pipes, and Veeder-root system. (*Id.* ⁋ 46; Ibrahim Dep. Tr. at 84:21-85:3, 131:13-132:6; Bernstein Aff. Ex. 25 at BPPL003430.) In or about late May or early June 2017, Gasmart stopped operating at the Service Station. (Pl. 56.1 ⁋ 94; Ibrahim Dep. Tr. at 139:2-15.) Although Gasmart vacated the Service Station, gasoline and diesel remained in the tanks. (Pl. 56.1 ⁋ 95; Ibrahim Dep. Tr. at 156:9-157:24.) Much of the remaining fuel could only be removed through a pump or hose in the tank. (Ibrahim Dep. Tr. at 157:13-24.)

### iv.    WPHA's 2014 Investigation of Soil and Groundwater Contamination

In or about September 2014, Tyree Environmental Corporation ("Tyree"), a consultant to Getty Properties Corporation, installed two temporary monitoring wells, MW-110 and MW-111, to collect groundwater samples in the Brookfield Street sidewalk immediately adjacent to the east

side of the Service Station.  (Pl. 56.1 ₱ 48; Talimcioglu I Dep. Tr. at 302:10-303:4; Bernstein Aff. Ex. 27 at GTKS_009155, GTKS_009157.)  The monitoring wells were installed as part of a pre-excavation assessment.  (Bernstein Aff. Ex. 27 at GTKS_009155.)

Thereafter, between September 8 and 19, 2014, First Environmental, Inc. ("FE"), WPHA's environmental consultant, took split samples of the soil and groundwater at MW-110 and MW-111.  (Pl. 56.1 ₱ 49; Talimcioglu I Dep. Tr. at 302:17-303:4; Bernstein Aff. Ex. 28 ("2014 FE Report") at WPHA002859.)  FE's Remedial Investigation and Split Sampling Results report (the "Report") revealed that the soil samples for MW-110 included (1) 280 ppb of benzene, which exceeded NYSDEC's soil cleanup levels of 60 ppb, and (2) 79,000 ppb of 1,2,4-trimethylbenzene, which exceeded NYSDEC's soil cleanup levels of 3,600 ppb.  (Pl. 56.1 ₱ 50; 2014 FE Report at WPHA002862.)  As to MW-111, the Report indicated that soil samples contained exceedances for chemicals such as xylene and n-propylbenzene.  (Pl. 56.1 ₱ 51; 2014 FE Report at WPHA002862.)

The Report further provided groundwater results for MW-110 and MW-111.  The groundwater at MW-110 contained 240 ppb of benzene (against a NYSDEC standard of 1 ppb) and 3,900 ppb of 1,2,4-trimethylbenzene (against a NYSDEC standard of 5 ppb).  (Pl. 56.1 ₱ 52; 2014 FE Report at WPHA002864.)  Meanwhile, the groundwater at MW-111 contained 1,400 ppb of benzene and 83 ppb of 1,2,4-trimethylbenzene, both of which were amounts that exceeded NYSDEC's groundwater standards.  (Pl. 56.1 ₱ 53; 2014 FE Report at WPHA002864.)

*v.   The 2015 Site/Remedial Investigation of WPHA's Property*

In April 2015, FE conducted a site and remedial investigation at portions of WPHA's property, including at Building 33, that were adjacent to the Service Station.  (Pl. 56.1 ₱ 55; Bernstein Aff. Ex. 30 at BPPL000503.)  As part of the investigation, FE installed six temporary monitoring wells, TWB-1 through TWB-6, to the north and northwest of the Service Station.  (Pl.

56.1 ⸿ 56; Bernstein Aff. Ex. 30 at BPPL000510, BPPL00516.).  FE also sampled the existing monitoring well at MW-106.  (Pl. 56.1 ⸿ 56.)

Thereafter, FE issued its October 2015 Site Investigation and Remedial Investigation Report (the "Oct. 2015 SI/RI Report").  FE had found gasoline-associated VOCs at levels above NYSDEC's standards in the soil and groundwater migrating from the Service Station to WPHA's property.  (Pl. 56.1 ⸿ 57; Bernstein Aff. Ex. 30 at BPPL000513-14.)  For example, soil samples from TWB-2, which was to the north and downgradient of the Service Station (Reinhart Dep. Tr. at 67:22-68:6), contained 33,000 ppb of 1,2,4-trimethylbenzene (against NYSDEC's standard of 3,600 ppb), and 2,100 ppb of xylenes (against NYSDEC's standard of 260 ppb).  (Pl. 56.1 ⸿ 60; Bernstein Aff. Ex. 30 at BPPL000517.)  Meanwhile, soil samples for TWB-5, which was also to the north and downgradient of the Service Station (Reinhart Dep. Tr. at 68:7-11), contained 23,000 ppb of 1,2,4-trimethylbenenzen and 9,700 ppb of xylenes, both of which were amounts that exceeded NYSDEC's soil cleanup levels.  (Pl. 56.1 ⸿ 61; Bernstein Aff. Ex. 30 at BPPL000517.)

Regarding the groundwater samples, results from TWB-2 revealed contamination level of (1) 30 ppb of benzene (against NYSDEC's water quality standard of 1 ppb), (2) 2,600 ppb of 1,2,4-trimethylbenzene (against NYSDEC's water quality standard of 5 ppb), and (3) 2,700 ppb of m&p-xylenes (against NYSDEC's water quality standard of 260 ppb).  (Pl. 56.1 ⸿ 62; Bernstein Aff. Ex. 30 at BPPL000519.)  Similarly, groundwater results from TBW-5 revealed contamination levels of 2,900 ppb of 1,2,4-trimethylbenzene and 5,100 ppb of m&p-xylenes, both of which were amounts that exceeded acceptable water quality standards.[9]  (Pl. 56.1 ⸿ 63; Bernstein Aff. Ex. 30 at BPPL000519.)

---

[9]     According to the Oct. 15 SI/RI Report, the groundwater at TWB-4 and TWB-6 contained chemicals such as 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, ethylbenzene, and m&p-xylenes, all at levels above NYSDEC's acceptable water quality standards.  (Pl. 56.1 ⸿ 64; Bernstein Aff. Ex. 30 at BPPL000519.)

As the report concluded, "the results of the field investigation indicate[d] a larger area of impact than previously believed." (Bernstein Aff. Ex. 30 at BPPL000514.) The report further explained that "based on the [s]ite geology, the horizontal and vertical extent of petroleum impacts in soil groundwater, and the fact that the area is adjacent to the BP station," it was reasonable to assume that the investigated area was "impacted by the [Service Station]." (*Id.*)

Relying on the results from FE's 2014 and 2015 investigations, WPHA served Marianina a RCRA Notice of Endangerment, which provided notice of actual and threatened endangerments, releases, injuries, and damages emanating from the Service Station on to WPHA's property. (Pl. 56.1 ⁋ 66; Bernstein Aff. Exs. 31 & 32.)

### vi. FE's December 2015 Site Investigations

Around December 2015, FE installed five monitoring wells to better define the groundwater flow direction and the extent of the contamination plume migrating from the Service Station. (Pl. 56.1 ⁋ 68; Bernstein Aff. Ex. 10 ⁋ 10 & fig. 8.) As reflected in FE's Groundwater Flow Direction map, one monitoring well, MW-201, was located directly between the Service Station and Building 33, on the southwest corner of the Building 33 parking lot, while a separate monitoring well, MW-203, was located between the Service Station and Building 33, near the southern wing of Building 33. (Pl. 56.1 ⁋⁋ 69-70; Bernstein Aff. Ex. 10 at fig. 8.)

The groundwater analytical results from the December 2015 sampling found gasoline related compounds in MW-201 and MW-203. (Pl. 56.1 ⁋⁋ 71-73; Bernstein Aff. Ex. 10 ⁋ 33 & tbl. 2.) Specifically, the results revealed that the groundwater in both monitoring wells were contaminated with 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, ethylbenzene, and m&p-xylenes at levels that exceeded NYSDEC's water quality standards. (Pl. 56.1 ⁋⁋ 72-73; Bernstein

---

Similarly, groundwater results for TWB-3 exceeded NYSDEC's acceptable water quality standards for 1,2,4-trimetyhlbenzene. (Pl. 56.1 ⁋ 65; Bernstein Aff. Ex. 30 at BPPL000519.)

Aff. Ex. 10 ¶ 33 & tbl. 2.)  Lead was identified in all five groundwater monitoring wells.  (Bernstein

Aff. Ex. 10 ¶ 33.)  Ultimately, based on the sampling data collected on April 2015 and December

2015, FE determined that the migration of the contamination plume was seemingly moving

northwesterly from the Service Station to WPHA's property.  (*Id.* ¶ 33 & fig. 9.)

### vii. The November 2016 Remedial Investigation Report

In or around August 2016, FE conducted additional groundwater and soil investigations on

portions of WPHA's property in the vicinity of Building 33 and adjacent to the Service Station.

(Pl. 56.1 ¶ 76.)  The results of that August 2015 investigation were published in FE's November

29, 2016 Remedial Investigation Report (the "Nov. 2016 Report").  (Bernstein Aff. Ex. 37 at

BPPL000334.)  As described in the Nov. 2016 Report, the August 2016 groundwater sampling

results for MW-201 reflected significant exceedances for benzene, 1,2,4-trimethylbenzene, 1,3,5-

trimethylbenzene, ethylbenzene, and m&p-xylenes.  (Pl. 56.1 ¶ 77; Bernstein Aff. Ex. 37 at

BPPL000367.)  Similarly, the August 2016 groundwater sampling results for MW-203 revealed

significant exceedances for 1,2,4-trimethylbenzene, 1,3,5-trimethlybenzene, ethylbenzene, and

m&p-xylenes.  (Pl. 56.1 ¶ 78; Bernstein Aff. Ex. 37 at BPPL000367.)  Relying on its previous

three investigations, FE confirmed that the groundwater plume continued to migrate from the

Service Station onto WPHA's property, moving in the direction of Building 33.  (Pl. 56.1 ¶ 79;

Bernstein Aff. Ex. 37 at BPPL000355, BPPL000374.)

On December 16, 2016, Nazmi Talimcioglu, a senior associate at FE, sent the Nov. 2016

Report to NYSDEC.  (Bernstein Aff. Ex. 38 ¶ 2.)  Thereafter, on December 20, 2016, after

receiving the report, NYSDEC issued a spill report, Spill Number 1608924, for the Service Station.

(Pl. 56.1 ¶ 81; Bernstein Aff. Ex. 39 at BP-WPHA004480.)  The spill report indicated that there

was "[s]ignificant soil and groundwater identified off-site" at the station.  (Pl. 56.1 ¶ 82; Bernstein

Aff. Ex. 39.)  Specifically, the spill report explained, "[s]amples collected in September 2014,

December 2015, and August 2016 reveal[ed] soil and groundwater contamination down gradient of [the Service Station]."  (Pl. 56.1 ℙ 83; Bernstein Aff. Ex. 39 at BP-WPHA004480.)

On December 21, 2016, NYSDEC advised Marianina of Spill Number 1608924. (Pl. 56.1 ℙ 84; Bernstein Aff. Ex. 40.)  The letter stated that NYSDEC considered Marianina "a potential responsible party" for the "contaminants in both the soil and groundwater down gradient" of the Service Station.[10]  (Bernstein Aff. Ex. 40.)  NYSDEC indicated that it would require a site assessment at the facility, followed by appropriate remedial actions.  (*Id.*)  To that end, NYSDEC directed Marianina to prepare and submit a Site Assessment Work Plan by January 11, 2017.  (*Id.*)

*viii.    HES's 2017 Subsurface Investigation*

In or about January 2017, Marianina hired HydroEnvironmental Solutions, Inc. ("HES") to perform a subsurface investigation of the Service Station.  (Pl. 56.1 ℙ 86; Bernstein Aff. Ex. 41 ("HES Report") at BPPL002532-33; *see also* Codella Dep. Tr. at 81:2-18.)  To facilitate its investigation, HES installed seven soil borings and three temporary groundwater monitoring wells across the property.  (HES Report at BPPL002533.)  HES also collected soil and groundwater samples.  (*Id.* at BPPL002533-34.)

During its sampling, HES observed free product in both soil and groundwater underneath the Service Station.  (Pl. 56.1 ℙ 88; HES Report at BPPL002535.)  As a result, on January 19, 2017, Timothy Bishop, HES's Project Manager, informed Codella of "significant soil and groundwater impacts from gasoline at multiple locations across the site."  (Pl. 56.1 ℙ 89; Bernstein Aff. Ex. 42.)  Bishop also noted that "borings designated 1 through 5 and 7 were all impacted from 8-12 feet below grade, which [was] consistent with the depth of the saturated zone."  (Bernstein

---

[10]     Bendell testified that "groundwater down gradient of [the] facility" meant that the groundwater was traveling "north, northwest" onto WPHA's property.  (Bendell II Dep. Tr. at 275:3-16.)

Aff. Ex. 42.)  As Bishop later testified, this indicated that "the contamination . . . impacted both soil and groundwater at those locations."  (Bernstein Aff. Ex. 12 at Tr. 29:10-30:8.)

As later reflected in its report, HES's investigation found petroleum-related contamination in the soil under the Service Station at concentrations exceeding NYSDEC's soil clean up levels for ethylbenzene, isopropylbenzene, n-propylbenzene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, and xylenes.  (Pl 56.1 ¶ 90; HES Report at BPPL002539.)  Meanwhile, groundwater results at the boring immediately adjacent to WPHA's property revealed the presence of numerous petroleum-related contaminants at concentrations that exceeded NYSDEC's Ambient Water Quality Standards.  (Pl. 56.1 ¶ 91; HES Report at BPPL002541.)  HES concluded that the "[s]oil screening and laboratory analyses . . . indicate[d] that petroleum hydrocarbon impacts exist in the soil and groundwater beneath" the Service Station.[11]  (Pl. 56.1 ¶ 93; HES Report at BPPL002536.)  HES also determined that the hydrocarbon impacts were "related to gasoline and not diesel fuel."  (HES Report at BPPL002536.)

## C. NYSDEC's Consent Order and Attempts to Compel Remediation

On September 27, 2017, after this action had commenced, NYSDEC sent Codella a Notice of Violation, which informed him that NYSDEC considered him "as the Responsible Party for open petroleum Spill No. 16-08924."  (Pl. 56.1 ¶¶ 96-97; Bernstein Aff. Ex. 46 at BPPL002774.)  The letter indicated that Codella had "exceeded the allowable time to submit a Remedial Work Action Plan" for the Service Station.  (Bernstein Aff. Ex. 46 at BPPL002774.)  NYSDEC therefore intended to hire a contractor to conduct a site assessment and complete appropriate remedial

---

[11]     Specifically, HES had found, *inter alia*, (1) elevated volatile organic vapors, (2) "concentrations of VOCs and SVOCs in two of the soil samples" that were "above their respective NYSDEC Unrestricted Use Soil Cleanup Objectives," and (3) "concentrations of VOC and SVOC constituents"—particularly petroleum hydrocarbons—in the groundwater that exceeded NYSDEC's standards.  (HES Report at BPPL002535-36.)

17

actions.  (*Id.*)  The letter directed Codella and his attorney to attend a settlement conference, which was scheduled for October 6, 2017.  (*Id.* at BPPL002775.)

Several months later, on February 2, 2018, Marianina and NYSDEC entered into a consent order for Marianina's alleged violations of the Navigation Law (the "First Consent Order").  (Pl. 56.1 ¶ 108; Bernstein Aff. Ex. 49 at BPPL004739, BPPL004744; Bendel I Dep. Tr. at 83:18-85:21.)  The First Consent Order required Marianina to "conduct an investigation and remediation of the petroleum contamination at and emanating from" the Service Station.  (Pl. 56.1 ¶ 109; Bernstein Aff. Ex. 49 at BPPL004739.)   To that end, Marianina was directed to "submit to [NYSDEC] a workplan, with a schedule of implementation, to conduct further investigation and remediation at [the Service Station] and off-site."  (Bernstein Aff. Ex. 49 at BPPL004740.)

However, on November 30, 2018, NYSDEC served Marianina with a Notice of Hearing and Complaint.  (Pl. 56.1 ¶ 110; Bernstein Aff. Ex. 50 at BPPL008134, BPPL008138.)  NYSDEC alleged that Marianina had not substantially complied with the First Consent Order by failing to submit a workplan, not replying to NYSDEC's requests to meet, and failing to clean the facility, thereby causing petroleum contamination to remain on site.   (Bernstein Aff Ex. 50 at BPPL008138-8140.)  The following month, on December 18, 2018, NYSDEC met with Marianina to discuss Marianina's violation of the First Consent Order and the on and off-site investigation and remediation that NYSDEC had requested Marianina perform.  (Pl. 56.1 ¶ 113; Bernstein Aff. Ex. 53 at MOC 42; Bendell II Dep. Tr. at 231:25-234:10.)  During the meeting, NYSDEC asked Marianina "to remediate the contamination on and off their site" and to submit a work plan to address the scope of the on and off-site investigation and remediation.  (Bendell II Dep. Tr. at 232:19-233:23.)  Two days later, on December 20, 2018, NYSDEC provided Marianina with a

new consent order (the "Second Consent Order") for Marianina's signature.  (Pl. 56.1 ¶ 114; Bernstein Aff. Ex. 53 at MOC 41.)

On January 7, 2019, NYSDEC reminded Marianina that it had not yet received the signed Second Consent Order.  (Pl. 56.1 ¶ 115; Bernstein Aff. Ex. 53 at MOC 40.)  Marianina replied that it had decided to undertake the remediation of its property and the adjoining property, and that Codella had planned to secure additional funds to perform the cleanup.  (Pl. 56.1 ¶ 116; Bernstein Aff. Ex. 53 at MOC 33, MOC 39.)  The next month, on January 17, 2019, NYSDEC provided Marianina with a revised Second Consent Order, which now required Marianina to perform the cleanup work and pay a $50,000 penalty.  (Pl. 56.1 ¶ 117; Bernstein Aff. Ex. 53 at MOC 30.) NYSDEC informed Marianina's counsel that failure to comply would result in another $100,000 penalty and NYSDEC's undertaking of the remediation.  (Bernstein Aff. Ex. 53 at MOC 30.)  On January 25, 2019, Marianina's submitted a work plan to NYSDEC, but, in the absence of a signed consent order, NYSDEC informed Marianina that it would not review the work plan.  (Pl. 56.1 ¶¶ 118-19; Bernstein Aff. Ex. 53 at MOC 22, MOC 30.)  Marianina replied that same day with proposed revisions to the Second Consent Order, which were rejected by NYSDEC.  (Pl. 56.1 ¶¶ 120-123; Bernstein Aff. Ex. 53 at MOC 116-20.)  To date, although it has pushed for these rejected revisions to the Second Consent Order, Marianina has ultimately failed to provide a signed consent order to NYSDEC and still does not have a NYSDEC-approved work plan to commence remediation.  (Pl. 56.1 ¶¶ 124-29, 134; Bernstein Aff. Ex. 53 at MOC 87-102, MOC 113-116.)

### D.  Marianina's State Action

On December 13, 2017, Marianina filed a verified complaint in the Supreme Court of the State of New York, Westchester County, against Gasmart, Barrier, and Fawzi Ibrahim (the" State Action").  (Pl. 56.1 ¶ 100; Bernstein Aff. Ex. 22 at BP-WPHA000777.)  The complaint, which was

sworn to by Codella, alleged that Gasmart, Barrier, and Ibrahim had caused "the spill, release and continuing migration of gasoline and its breakdown products including benzene and other solid wastes and hazardous substances . . . on to adjoining properties."  (Pl. 56.1 ₱ 102; Bernstein Aff. Ex. 22 ₱₱ 58-62.)  Specifically, Marianina maintained, the "discharge of gasoline" at the Service Station had migrated "onto the [WPHA's] property in the vicinity of building 33 and its adjacent areas," which were the proximate cause of damage to WPHA.  (Pl. 56.1 ₱₱ 103, 105; Bernstein Aff Ex. 22 ₱₱ 50, 61.)

### E.  Alleged Impact of Contamination on WPHA's Property

#### i.   Direct Impact of Contamination to WPHA

According to WPHA, FE estimates that remediating the contaminated portion of WPHA's property will cost between \$558,300.00 and \$614,150.00.  (Pl. 56.1 ₱ 135; Bernstein Aff. Ex. 58 at 1.)  Meanwhile, in approximately 6.6 years, the plume from the Service Station will reach Building 33 at concentrations that will cause vapor intrusion to tenants.  (Pl. 56.1 ₱ 138; Bernstein Aff. Ex. 59 ("Talimcioglu II Dep. Tr.") at 226:3-13, 272:9-273:23.)  As Talimcioglu has testified, it would not be safe to simply do nothing to remediate the area between the Service Station and Building 33.  (Pl. 56.1 ₱ 139; Talimcioglu I Dep. Tr. at 303:19-304:10.)

#### ii.   Economic Impact of Contamination to WPHA

WPHA is currently involved in a long-term project to replace the buildings at the Winbrook Apartments with new, modern, energy efficient buildings.  (Pl. 56.1 ₱ 142; Bernstein Aff. Ex. 63 at BPPL004898.)  The original proposal from Trinity Financial, Inc. ("Trinity") to WPHA, submitted in 2016, included a replacement for Building 33.  (Pl. 56.1 ₱ 146; Bernstein Aff. Ex. 62 ("Bigby Dep. Tr.") at 201:13-203:19; Bernstein Aff. Ex. 63 at BPPL004908.)  However, in a later proposal, Building 33 was removed from the project's plans.  (Pl. 56.1 ₱ 148; Bigby Dep. Tr. at 203:20-205:4; Bernstein Aff. Ex. 64; Aff. of Norman W. Bernstein as to Confidential Materials

Ex. 1 at BPPL010561(submitted under seal).)  This reduced the total number of units that would

be developed under the project from 776 units to 530 units.  (Pl. 56.1 ¶¶ 145, 152; Bigby Dep. Tr.

at 201:13-202:10.)  Because the number of public-housing-rate units WPHA may offer for rent is

fixed at approximately 360 units, the reduction will result in WPHA losing a disproportionate

amount of higher income-producing rental units.  (Pl. 56.1 ¶ 154; Bigby Dep. Tr. at 205:1-24.)

The reason Building 33 was removed from the development plan was due to the

contamination in the vicinity of building.  (Pl. 56.1 ¶ 149; Bigby Dep. Tr. at 208:6-12, 210:9-21,

211:17-212:2, 215:25-219:25, 221:19-222:14.)  Specifically, Trinity believed that it would be cost-

prohibitive to develop in the contaminated area.  (Pl. 56.1 ¶ 151; Bigby Dep. Tr. at 53:22-55:19.)

Testimony indicates that, if there was no contamination, Building 33 could be placed back in the

master development plan.  (Bigby Dep. Tr. at 220:8-221:15.)[12]

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material

fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Thus, summary judgment will not lie where there is a "dispute[] over facts that might affect the

outcome of the suit under the governing law" and "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  "The Supreme Court has made clear that 'at the summary judgment stage the judge's

---

[12]    Separately, on August 20, 2019, the City of White Plains Urban Renewal Agency ("WPURA") gave notice
to property owners along a portion of East Post Road, including Marianina and WPHA, that it was
considering initiating condemnation proceedings for several parcels of land, including the Service Station
and a small portion of WPHA.  (Pl. 56.1 ¶ 130; Bernstein Aff. Ex. 54 at 1-2.)  The portion of WPHA's land
at issue included the soil and groundwater contamination area.  (Pl. 56.1 ¶ 131; Bernstein Aff. Ex. 54 at 5.)
Several months later, on December 5, 2019, WPURA announced, via Resolution 05-2019, its intention to
move forward with condemnation proceedings, if necessary.  (Pl. 56.1 ¶ 113; Bernstein Aff. Ex. 56 at 1.)  In
a separate resolution, Resolution 06-2019, adopting WPURA's Determination and Findings pursuant to New
York's Eminent Domain Procedure Law, WPURA again reiterated that any acquisition of property by
condemnation would be done "if necessary."  (Bernstein Reply Aff. Ex. 8 at 9.)

function is not [] to weigh the evidence and determine the truth of the matter[.]'" *Westinghouse Elec. Corp. v. N.Y.C. Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). Rather, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. In deciding a motion for summary judgment, courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal citation and quotations omitted).

The moving party bears the initial burden of pointing to evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by showing "that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal citation and quotation marks omitted).

The party asserting that a material fact is genuinely disputed must support his or her assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). In addition, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Plaintiff moves for summary judgment on the issue of liability as to its RCRA, NYNL, and state common law claims.  (Mot. 2.)  The Court will first address Plaintiff's RCRA claim.  The Court will then turn to Plaintiff's state law claims.

### I.   Plaintiff's RCRA Claim

"RCRA is a 'comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste.'"  *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 205 (2d Cir. 2009) (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).  The statute's "primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste . . . 'so as to minimize the present and future threat to human health and the environment.'"  *Meghrig*, 516 U.S. at 483 (quoting 42 U.S.C. § 6902(b)).

RCRA contains a citizen suit provision, 42 U.S.C. § 6972, "which permits private citizens to enforce its provisions in some circumstances."  *Meghrig*, 516 U.S. at 484.  As relevant here, to prevail on a claim brought under 42 U.S.C. § 6972(a)(1)(B), a plaintiff must establish that

> (1) the defendant was or is a generator or transporter of solid or hazardous waste or owner or operator of a solid or hazardous waste treatment, storage or disposal facility, (2) the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste, as defined by RCRA, and (3) [] the solid or hazardous waste in question may pose an imminent and substantial endangerment to health or the environment.

*Prisco v. A & D Carting Corp.*, 168 F.3d 593, 608 (2d Cir. 1999); *accord Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, No. 99 Civ. 0275(RWS), 2004 WL 1811427, at *10 (S.D.N.Y. Aug. 12, 2004).

Regarding the first element, RCRA defines "disposal" as

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or

> hazardous waste or any constituent thereof may enter the environment or be emitted
> into the air or discharged into any waters, including ground waters

42 U.S.C. § 6903(3).  Relatedly, the term "solid waste" includes "discarded material, including

solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial,

mining, and agricultural operations." *Id.* § 6903(27).  Gasoline and "[p]etroleum [are] considered

a hazardous and solid waste under RCRA." *Bologna v. Ker-McGee Corp.*, 95 F. Supp. 2d 197,

201 (S.D.N.Y. 2000); *United States v. Hill*, No. 95-CV-1716 (RSP/GJD), 1998 WL 278291, at *3

(N.D.N.Y. May 20, 1998) ("[L]eakage of gasoline from an underground storage tank into the

surrounding soil constitutes disposal of a solid waste under RCRA"); *see also Emerson Enters.,*

*LLC v. Kenneth Crosby N.Y., LLC*, 781 F. Supp. 2d 166, 176 (W.D.N.Y. 2011) ("Courts in this

Circuit have held that petroleum is a 'solid or hazardous waste.'").

Turning to the second element, the "term 'contributed to' is not defined under RCRA, so

courts have looked to its ordinary meaning." *Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield*

*Co.*, 138 F. Supp. 2d 482, 487 (S.D.N.Y. 2001) (internal citation omitted).  To this end, "relevant

legislative history supports a broad, rather than a narrow, construction of" the term. *Fitzgibbons*

*v. City of Oswego*, No. 5:10-CV-1038 (FJS/ATB), 2011 WL 6218208, at *12 (N.D.N.Y. Dec. 13,

2011) (internal quotations and citation omitted); *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d

81, 112 (E.D.N.Y. 2001) ("'Although RCRA's contemporaneous legislative history is not very

helpful . . . subsequent reports which reviewed the statute after enactment expressly state that

'contributing to' is to be liberally construed.'").  And in favoring this broad construction, other

federal circuits have concluded that the "term for RCRA purposes means that a defendant must

'be actively involved in or have some degree of control over,' 'have a share in any act or effect,'

or 'act as a determining factor.'"[13] *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*,

---

[13]     The Court has not identified any Second Circuit case interpreting the term "contribute" under RCRA.

405 F. Supp. 3d 408, 436 (W.D.N.Y. 2019) (collecting cases); *see also Cox v. City of Dallas Tex.*, 256 F.3d 281, 295 (5th Cir. 2001) ("[W]e follow our sister circuits' lead and interpret 'contribute' to mean 'have a part or share in producing an effect.'").

As it relates to the third element, a plaintiff may bring a suit "only upon a showing that the solid or hazardous waste at issue 'may present an imminent and substantial endangerment to health or the environment.'" *Meghrig*, 516 U.S. at 485 (quoting 42 U.S.C. § 6972(a)(1)(B)).  Regarding the imminency of an endangerment, "this language implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Id.* at 486; *see also Simsbury-Avon*, 575 F.3d at 210 (explaining that "'imminency' requires a showing that a 'risk of threatened harm is present'").  But "liability under 42 U.S.C. § 6972 is not 'limited to emergency-type situations.'" *Simsbury-Avon*, 575 F.3d at 210 (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991), *rev'd in part on other grounds*, 505 U.S. 557 (1992)).  Nor does a finding of imminency "require a showing that actual harm will occur immediately." *Dague*, 935 F.2d at 1356.  Instead, an "'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Id.* (quoting *Envtl. Defense Fund v. Envtl. Prot. Agency*, 465 F.2d 528, 535 (D.C. Cir. 1972)).  Meanwhile, for the endangerment to be "substantial," there must be "reasonable cause for concern that someone or something may be exposed to risk of harm if prompt remedial action is not taken." *Fresh Air for the Eastside*, 405 F. Supp. 3d at 438 (quoting *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 707 (W.D.N.Y. 2011)); *see also Simsbury-Avon*, 575 F.3d at 211 (explaining that there is "reasonable prospect of future harm" if "the threat is near-term and involves potentially serious harm").

Here, Plaintiff has established Defendant's liability under RCRA.  To begin, the undisputed evidence proffered by Plaintiff makes clear that Defendant was an owner of a storage and/or

disposal facility of solid or hazardous waste as defined under the statute. Indeed, Defendant owned, and at times operated, a gas station that contained several USTs holding gasoline. (*See* Pl. 56.1 ⁋⁋ 6-8; Bernstein Aff. Ex. 17 at 1.)

As to Defendant's contribution to the storage and disposal of solid or hazardous waste, the undisputed record further reveals that at various points throughout its ownership, Defendant was aware of contaminants in the soil and groundwater under the Service Station that were moving toward Plaintiff's property. (*See* Pl. 56.1 ⁋⁋ 38-40, 89-93; Castellano Dep. Tr. at 118:7-12; HES Report at BPPL002536.) Yet, although it remained responsible for maintaining the Service Station's USTs, underground pipes, and Veeder-root system (Pl. 56.1 ⁋ 46), Defendant did not take any remedial action to clear up the existing contamination (*see id.* ⁋⁋ 129, 134). This undisputed evidence in the record allows the Court to conclude that Defendant is a contributor under RCRA. *See N.Y. Cmtys. for Change v. N.Y.C. Dep't of Educ.*, No. 11 CV 3494(SJ), 2012 WL 7807955, at \*25-26 (E.D.N.Y. Aug. 29, 2012) (concluding, on a motion to dismiss, that "as in the context of UST leaks, defendants may be liable for their more passive conduct with respect to the PCB ballasts based on their authority and control over the fixtures"); *Zands v. Nelson*, 797 F. Supp. 805, 810 (S.D.N.Y. 1992) (concluding, under a liberal interpretation of contribution, that "owners and operators contribute to the contamination if the contamination is the direct result of activities related to the operation of a gas station").

Finally, as to the existence of an imminent and substantial endangerment, recent investigations into the Service Station's soil and groundwater had uncovered petroleum-related contamination at concentrations substantially exceeding NYSDEC's soil and groundwater standards (HES Report at BPPL002539, BPPL002541), and these contaminants have not been remediated to date (Pl. 56.1 ¶¶ 129, 134). Moreover, the various soil and groundwater samples

taken between 2014 through 2016 have shown that the contamination plume containing these exceedances is migrating from the Service Station onto Plaintiff's property.  (Bernstein Aff. Ex. 10 ¶ 33, tbl. 2, fig. 9; *id.* Ex. 37 at BPPL000355, BPPL000374; *id.* Ex. 39 at BP-WPHA004480.) To be sure, this existing contamination may not be affecting Plaintiff's tenants today, but testimony in the record indicates that it would plainly be unsafe to do nothing.  Indeed, in approximately 6.6 years the contamination plume will reach Building 33 at concentrations that will cause vapor intrusion to tenants.  (Talimcioglu II Dep. Tr. at 226:3-13, 272:9-273:23; Talimcioglu I Dep. Tr. at 303:19-304:10.)  Accordingly, under RCRA, the contamination emanating from Defendant's property poses an imminent and substantial endangerment to the health and environment of Plaintiff and its community.  *See 87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1218 (S.D.N.Y. 2002) (recognizing that "[e]vidence of ground water contamination by oil . . . could [] support a finding of environmental harm"); *Nashua Corp. v. Norton Co.*, 116 F. Supp. 2d 330, 357 (N.D.N.Y. 2000) (finding that imminent and substantial endangerment existed where there were "substantial remnants from [a chemical] leak in both the groundwater and the soil" emanating from contaminated wells that was "reasonably close" in proximity to residential neighborhood).

In sum, Plaintiff has established Defendant's liability under section 6972(a)(1)(B) of RCRA.  The Court GRANTS Plaintiff's motion for summary judgment on its RCRA claim.

## II.   Plaintiff's NYNL Claim

NYNL § 181 provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained."  NYNL § 181(1).  An injured entity may bring a claim "directly against the person who has discharged [] petroleum" for the "costs of cleanup and removal and

direct and indirect damages based on the strict liability imposed" by the statute.  *Id.* § 181(5).

"This includes costs incurred from investigation and remediation of petroleum," *Niagara Mohawk*

*Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 137 (2d Cir. 2010) (citing *New York v. LVF*

*Realty Co.*, 59 A.D.3d 519, 521 (2d Dep't 2009)), as well as "damages for either temporary or

permanent injury to real property, or both."  *Sunoco, Inc. (R & M) v. 175-33 Horace Harding*

*Realty Corp.*, 969 F. Supp. 2d 297, 309 (E.D.N.Y. 2013) (citing *Hanna v. Motiva Enters., LLC*,

839 F. Supp. 2d 654, 679 (S.D.N.Y. 2012)).

 To establish liability under NYNL § 181, a plaintiff must demonstrate that "(1) defendants

are dischargers under the statute; (2) a discharge occurred; and (3) the discharge contaminated

plaintiff['s] property." *Lambrinos v. Exxon Mobil Corp.*, No. 1:00-CV-1734, 2004 WL 2202760,

at *7 (N.D.N.Y. Sept. 29, 2004) (summarizing New York State law).   Under the statute, "a

'discharge' includes '*any* intentional or *unintentional action or omission* resulting in' the spilling

of petroleum."[14]  *State v. Green*, 96 N.Y.2d 403, 406-07 (2001).  "Nothing in the statutory language

requires proof of fault or knowledge," and "the language is sufficiently broad to include

landowners . . . who have both control over activities occurring on their property and reason to

believe that their tenants will be using petroleum products."  *Id.* at 407.  This also encompasses

"both prior owners and successor-owners of gasoline stations and underlying property."  *See*

*Scarsdale Cent. Serv. Inc. v. Cumberland Farms, Inc.*, No. 13-cv-8730 (NSR), 2015 WL 678761,

at *7 (S.D.N.Y. Feb. 13, 2015) (citing *State v. Speonk Fuel, Inc.*, 3 N.Y.3d 720, 724 (2004); *Sunrise*

*Harbor Realty, LLC v. 35th Sunrise Corp.*, 86 A.D.3d 562, 565 (2d Dep't 2011)).   Ultimately,

---

[14]     As defined by the statute, a discharge "means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters."  NYNL § 172(8). Petroleum is defined as "oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene." *Id.* § 172(15).  Finally, "waters" is defined as, *inter alia*, "bodies of surface or groundwater, whether natural or artificial." *Id.* § 172(18).

liability on a potentially responsible party is predicated on the party's "capacity to take action to prevent an oil spill or to clean up contamination." *Speonk*, 3 N.Y.3d at 724; *State v. B & P Auto Serv Ctr., Inc.*, 29 A.D.3d 1045, 1047 ("[T]he question of whether an otherwise faultless owner is liable as a discharger turns on the owner's 'capacity to take action to prevent an oil spill or to clean up contamination resulting from a spill.'").  Such expansiveness comports with the mandate that the statute be "liberally construed to effect its purposes."  NYNL § 195.

Here, Plaintiff has established Defendant's liability under NYNL § 181.  As an initial matter, the record indicates that there was gasoline/petroleum-related contamination of the soil and groundwater under the Service Station, and that, even with some past remediation efforts, the contamination continued to persist in excessive quantities.  (Pl. 56.1 ⁋⁋ 38-39; P.W. Grosser Report at BPPL004502-03; HES Report at BPPL002536.)  Regardless of whether the contamination was intentional or unintentional, this plainly constitutes a discharge under the statute.  *See Green*, 96 N.Y.2d at 406-7; NYNL § 172(8), (15).

Moreover, as noted above, Defendant was an owner who had control over the activities occurring on its gas station, was seemingly aware of the existence of contamination on its property, but yet took no actions to, at the very least, effect an immediate cleanup of all areas of known contamination.  (*See* Pl. 56.1 ¶¶ 23-24, 38-40, 46 89-93; Codella Dep. Tr. at 39:15-41:3, 66:15-67:3, 206:7-208:12; Castellano Dep. Tr. at 118:7-12; HES Report at BPPL002536.)  Accordingly, the Court has no trouble finding that Defendant is a discharger under the statute.  *See State v. C.J. Burth Servs., Inc.*, 79 A.D.3d 1298, 1301 (3d Dep't 2010) (concluding that defendant was a discharger because it did nothing despite knowing that the storage system on its property had discharged petroleum, that the property was contaminated, and that cleanup was needed); *Lambrinos*, 2004 WL 2202760 at *7 ("The New York Courts of Appeals has assigned discharger

status, and thus liability, to landowners who 'can control activities occurring on its property and have reason to believe petroleum products will be stored there.'").

Finally, there is sufficient, undisputed evidence in the record (as noted above) that the plume emanating from the Service Station has resulted in the contamination of the groundwater and soil underneath Plaintiff's property. (Pl. 56.1 ¶¶ 79, 83; Bernstein Aff. Ex. 37 at BPPL000355, BPPL000374; *id.* Ex. 39 at BP-WPHA004480.) Therefore, the record supports a conclusion that Defendant's discharge is what contaminated Plaintiff's property. *See Lambrinos*, 2004 WL 2202760 at *8 (concluding that summary judgment as to liability warranted where "there [was] evidence of a plume of contamination flowing from the area of the former septic tank over which [defendant] exercised control").

At bottom, there is no material dispute of fact in the record regarding Defendant's liability under NYNL § 181. The Court GRANTS Plaintiff's motion for summary judgment as to the issue of liability on its NYNL claim.

## III.  Plaintiff' State Common Law Claims

### A.  Negligence

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)); *see also McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997) ("To state a cause of action for negligence, the plaintiffs must show: (1) that Olin owed them a 'duty, or obligation, recognized by law', (2) a breach of the duty, (3) a 'reasonably close causal connection between [defendant's] conduct and the resulting injury' and (4) loss or damage resulting from the breach.").  "The

existence of a duty is [the] *sine qua non* of a negligence claim: '[i]n the absence of a duty, as a matter of law, no liability can ensue.'" *Alfaro*, 210 F.3d at 114 (quoting *McCarthy*, 119 F.3d at 156). This is ultimately a "question of law for the court[]." *Am. Med. Distribs. v. Macdonald Tuskey*, No. 16-CV-6016 (VSB), 2018 WL 1478301, at *3 (S.D.N.Y. Mar. 23, 2018).

A duty "may arise from a special relationship that requires the defendant to protect against the risk of harm to plaintiff." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001). To this end, a landowner has "a duty to exercise reasonable care in the maintenance of [] leased premises to prevent foreseeable injury that might occur on the plaintiffs' adjoining property." *Plainview Props. SPE, LLC v. Cty. of Nassau*, 181 A.D.3d 731, 734 (2d Dep't 2020); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 725 F.3d 65, 117 (2d Cir. 2013) (concluding that the evidence supported a negligence verdict where the record contained evidence of "gasoline spills and leaks at [defendant]-controlled stations" that traveled into the surrounding environment and defendant "could have taken [steps] to prevent, or at least mitigate the damage from, the[] contamination incident"). This "duty arises not only when a *landowner* creates a dangerous condition on the land, but also when a third-party or force majeure creates it and the landowner knowingly fails to cure it." *White Plains Housing Auth v. Getty Props. Corp.*, No. 13-CV-6282 (NSR), 2014 WL 7183991, at *16 (S.D.N.Y. Dec. 16, 2014) (citing *532 Madison Ave.*, 96 N.Y.2d at 288-89). "[T]he mere failure to abate a known dangerous condition is a cognizable breach of duty. *Id.*

Here, all three elements of Plaintiff's negligence claim have been established. *First*, Defendant's property was adjacent to Plaintiff's property. (Pl. 56.1 ¶¶ 11-12; Carter Dep. Tr. 219:18-24; Bernstein Aff. Ex. 10 ¶ 31.) And as the adjacent property owner, Defendant had a duty

to keep its lands safe and free of contamination that could directly impact Plaintiff's property.  *See*

*Plainview Props.*, 181 A.D.3d. at 734.

*Second*, there is no material dispute that Defendant breached this duty.  As early as 1994,

Defendant was aware of soil and groundwater contamination on its property and near Plaintiff's

property, but it did not take steps to fully remediate these areas of known contamination.  (*See* Pl.

56.1 ¶¶ 38-39; Castellano Dep. Tr. at 193:8-194:2, 223:24-224:15, 239:24-240:23; P.W. Grosser

Report at BPPL004502-03.) Rather, the unrefuted record indicates that these areas of known

contamination were left unaddressed by the time Defendant leased its property to Barrier and then

Gasmart.  Then, by 2015 and 2016, Defendant had become aware that this contamination had, in

fact, been migrating onto Plaintiff's property.  (*See* Bernstein Aff. Exs. 31 & 32; *id.* Ex. 39 at BP-

WPHA004480.)  Indeed, Defendant seemingly acknowledged as much in the State Action.[15]  (*Id.*

Ex. 22 ¶¶ 58-62.)  But, despite this apparent awareness, Defendant has failed to take any action to

ameliorate the situation.  Its persistent failure to remediate the contamination on its property or the

migration of contamination on the Plaintiff's property plainly constitutes a breach of Defendant's

duty to Plaintiff.

*Finally*, the undisputed record supports a conclusion that Defendant's breach of duty

proximately caused Plaintiff's injuries.  As revealed by the various investigations into the

groundwater and soil of the Service Station and Plaintiff's property, the discharges at issue

originated from the Service Station, which, in turn, migrated in a north/northwest direction onto

Plaintiff's property.  (*Id.* Ex. 10 ¶ 33 & fig. 9.)  Those investigations further revealed that the

---

[15]    In the State Action, Defendant maintained it was the third parties' conduct that contaminated Plaintiff's
property.  But the undisputed record in this case indicates (as noted above), that Defendant was ultimately the entity
in control of underground instruments that led to the contamination.  (*See* Bernstein Aff. Ex. 25 at
BPPL003430.)  Thus, Defendant could still be liable here even if another entity's conduct that caused the
harm.  *See Getty*, 2014 WL 7183991, at *16

groundwater and soil contamination on the portions of Plaintiff's property adjacent to the Service Station contained various chemicals—many of which had also been found below the Service Station—that exceeded NYSDEC's applicable standards.[16]   (*Compare id.* Ex. 37 at BPPL000367 *with* HES Report at BPPL002539, BPPL002541.)   The uncontested evidence also indicates that this contamination will have physical and economic impacts to Plaintiff and its property.

In short, the Court concludes that Plaintiff has met its burden of establishing the absence of a material issue of fact surrounding Defendant's liability under a negligence theory.   The Court therefore GRANTS Plaintiff's motion for summary judgment on its negligence claim.

### B.  Private Nuisance

To establish a private nuisance under New York law, a plaintiff must show that a defendant's conduct "is a legal cause of the invasion of the interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, *or* (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." *Scribner v. Summers*, 84 F.3d 554, 559 (2d Cir. 1996) (quoting *Copart Indus. v. Consol. Edison Co.*, 41 N.Y.2d 568, 569 (1977)).   If the nuisance claim "has its origin in negligence, negligence must be proven."   *Murphy v. Both*, 84 A.D.3d 761, 763 (2d Dep't 2011) (collecting cases). Conversely, if its nuisance claim is based on an "intentional and unreasonable" invasion, a plaintiff must establish that (a) the defendant acted for the purpose of causing the invasion, or (b) knew that it was resulting or was substantially certain to result from the defendant's conduct.   *Scribner*, 84 F.3d at 559 (quoting *Copart*, 41 N.Y.2d at 571).   A defendant's failure to act can support a private nuisance claim, particularly where a defendant had learned of the nuisance and had a reasonable

---

[16]        In fact, Defendant acknowledged the contamination was the proximate cause of Plaintiff's harm in the State Action.   (Bernstein Aff. Ex. 22 ¶ 61.)

opportunity to abate it.  *See State of New York v. Shore Realty Corp.*, 759 F2.d 1032, 1050-51 (2d Cir. 1985).

Here, there is no dispute that there was an "invasion" of Plaintiff's private use and enjoyment of its property by way of contamination.  And as more thoroughly explained in the Court's negligence analysis, there is no material dispute that (1) Defendant was negligent in its handling of the underground contaminants emanating from its property and (2) this negligence was the proximate cause of Plaintiff's injuries.  In any event, Defendant's failure to act also amounts to "intentional and unreasonable" conduct resulting in the invasion of Plaintiff's use and enjoyment of its property.  As the record establishes, over twenty years had passed since Defendant learned of remaining contamination on its property, four years had passed since Defendant received Plaintiff's RCRA endangerment notice, three years had passed since NYSDEC issued its spill number to Defendant regarding the contamination on Plaintiff's property, and two and a half years had passed since the HES Report confirmed the continued presence of substantial contamination at the Service Station.  Yet, to date, the contamination—of which Defendant is plainly aware—has remained unaddressed.  On this record, then, there is no material dispute that Defendant had reasonable opportunities to act.  Its failure to do so, in turn, has harmed Plaintiff.

As Plaintiff has established that Defendant is liable for private nuisance, the Court GRANTS Plaintiff's motion for summary judgment on its private nuisance claim.

### C. Trespass

"Under New York law, trespass is the intentional invasion of another's property." *Scribner*, 84 F.3d at 557.  "To be liable, the trespasser need not intend or expect the damaging consequences of his intrusion; 'rather, he need only intend the act which amounts to or produces the unlawful invasion.'"  *Hanna*, 839 F. Supp. 2d at 671 (quoting *Scribner*, 84 F.3d at 557 (internal

quotations omitted)). "When trespass claims arise from the movement of noxious liquids from one property to another, the appropriate standard is whether defendants: (1) intended the act which amounts to or produces the unlawful invasion, and (2) had good reason to know or expect that subterranean and other conditions were such that there would be passage of the contaminated water from defendants' to plaintiffs' land." *Id.* The "intentional act" requirement for trespass is more stringent than the requirement for a private nuisance claim. *See Getty*, 2014 WL 7183991 at *14.

Here, Plaintiff contends that, for purposes of its trespass claim, the "intentional act" that caused the unlawful invasion onto Plaintiff's property was Defendant's ownership and operation of the Service Station. (Mot. 24.) But Plaintiff's position is better construed as premising trespass liability on Defendant's failure to act once it was aware of contaminants on its property. (*See id.* ("Marianina had good reason to know, and in fact did know, that unless effectively controlled the contamination on the [Service] Station would migrate onto the adjacent [] Property.").) When viewed under this lens, the Court agrees that Plaintiff has satisfied the intention requirement of its trespass claim. Although there is no evidence in the record that Defendant intended or even caused the initial contamination identified in 1994, the undisputed evidence reveals that Defendant repeatedly failed to fully remediate the contamination once it became aware of it. *Cf. Hanna*, 839 F. Supp. 2d at 671 (dismissing trespass claim where plaintiff failed to adduce evidence that "defendants intentionally, or negligently, took any action after the original release that caused the hydrocarbons from that release to migrate to, or failed to prevent the hydrocarbons from migrating to, plaintiffs' property"). Because Defendant also had good reason to know that the contamination at the Service Station would migrate to Plaintiff's property, the Court GRANTS Plaintiff's motion for summary judgment as to Defendant's liability for trespass.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED on the issue of liability.  The case shall proceed to discovery on the determination of damages and available injunctive relief.  The Court will issue an order of referral to Magistrate Judge Judith C. McCarthy for further discovery on the issue of damages and injunctive relief, and the parties are directed to contact Magistrate Judge McCarty within three days of that order to schedule such proceedings.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 103.

Dated: August 27, 2020                                    SO ORDERED:
White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge