UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WHITE PLAINS HOUSING AUTHORITY,

                                        Plaintiff,

        -against-

BP PRODUCTS NORTH AMERICA INC.,
MARIANINA OIL CORP., and ATLANTIC
RICHFIELD COMPANY,

                                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/19/2022

17-cv-6250 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff White Plains Housing Authority ("Plaintiff" or "WPHA") brings this action against Marianina Oil Corporation ("Defendant"),[1] [2] asserting claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the New York Navigation Law ("NYNL"), N.Y. Nav. Law § 181(5), as well as state common law claims for negligence, private nuisance, and trespass. (ECF No. 59.) Plaintiff alleges that its property was contaminated by discharges of gasoline and toxic-biproducts of gasoline emanating from a former gasoline station at 34 East Post Road, White Plains, New York (the "Service Station"), which was owned and operated by Marianina Oil Corporation. (*Id.*)

In the Court's August 27, 2020 Order and Opinion, the Court found that Defendant is liable under the RCRA, the New York Navigation Law, as well as negligence, private nuisance, and trespass under New York law. *See White Plains Hous. Auth. v. BP Prod. N. Am. Inc.*, 482 F. Supp.

---

[1]     By Stipulation and Order, dated November 19, 2019, Plaintiff's claims against Defendants BP Products North America, Inc., and Atlantic Richfield Company were dismissed with prejudice. (ECF No. 98.)

[2]     On December 16, 2022, the Court granted 34 EPR, LLC's motion for substitution as Defendant, in accordance with the Court's Order dated July 25, 2022 (ECF No. 223), wherein the Court conditioned the sale of the subject property provided that White Plains Medical Center Hospital (formally referred to as 34 EPR, LLC in its moving papers) will assume any and all existing liabilities, defenses, as well as the right to appeal just as Marianina Oil Corporation would, the procedural posture of the case will not change, and Plaintiff retains the same rights, claims, and defenses against White Plains Hospital it otherwise would possess as against Marianina. (*See* ECF No. 229.)

3d 95 (S.D.N.Y. 2020).  On September 20, 2020, Marianina filed for bankruptcy.  (ECF No. 191 at 2.)  On October 30, 2020, Magistrate Judge McCarthy issued a bench order stating that WPHA's claims for damages under state law were stayed by the bankruptcy filing but that the action seeking an injunction under the RCRA could continue.  (Minute Entry, Oct. 30, 2020.)  On August 31, 2021, the New York State Department of Environmental Conservation ("DEC") entered into an executed administrative order with the Defendant that incorporates a work plan for remediation of the contamination.  (*See* ECF No. 195, ("Lefkowitz Decl.") Exh. B ("August 2021 Consent Order")).

Now before the Court is Plaintiff's motion to preclude two "unauthenticated" drawings of a parking garage as well as expert testimony referencing those drawings.  (*See* ECF Nos. 190, 191, 196.)  The Court is also presented with Defendant's cross-motion to dismiss or in the alternative, to stay the action pursuant to 42 U.S.C. § 6972(b), which bars RCRA citizen suits where the state agency has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section; and (ii) the doctrine of primary jurisdiction, given that DEC has already issued the August 2021 Consent Order and that remedial efforts are already underway pursuant to a Remedial Work Action Plan (the "RAWP").  (*See* ECF Nos. 193, 194, 197, 198.)

For the following reasons, the Court RESERVES judgment on Plaintiff's motion to preclude and DENIES Defendant's motion to dismiss or stay in the alternative.

# BACKGROUND

## I.    Factual Background

The Court assumes familiarity with the underlying facts discussed in the Court's August 27, 2020 Order and Opinion on Plaintiff's motion for summary judgment.  *See White Plains Hous. Auth. v. BP Prod. N. Am. Inc*., 482 F. Supp. 3d 95 (S.D.N.Y. 2020).

As a summary, WPHA brings suit under the RCRA seeking remediation from the gasoline contamination that came from Defendant's Service Station, which has affected both soil and groundwater at the Service Station and at WPHA's property.  As discussed in the Court's August 27, 2020 Order and Opinion, with respect to direct contamination to WPHA's property, WPHA's environmental consultant opined that "in approximately 6.6 years, the plume from the Service Station will reach Building 33 at concentrations that will cause vapor intrusion to tenants" and "it would not be safe to simply do nothing to remediate the area between the Service Station and [WPHA's] Building 33."  *See White Plains Hous. Auth.*, 482 F. Supp. at 113.  Building 33 is one of the five public housing apartment buildings in WPHA's Winbrook Apartments complex, and WPHA's parking lot and Building 33 are directly adjacent to, and to the north/northwest of, the Service Station.  *See White Plains Hous. Auth*., 482 F. Supp. at 105.  The distance between the Service Station's property line and Building 33 is approximately 200 feet.  *Id*.

WPHA also faces economic impact of the contamination, namely, that it currently removed Building 33 from its plans to renovate the Winbrook Apartments complex due to the contamination in the vicinity of the building, which in turn reduces the total number units to be developed from 776 units to 530 units.  WPHA is therefore concerned it will lose income-producing rental units.

*Id.* at 113–14.   Testimony indicated that, if there was no contamination, Building 33 could be placed back in the master development plan.  *Id.* at 114.

Since the Court's August 27, 2020 Order and Opinion, Defendant has now entered into the August 2021 Consent Order and has provided the DEC with a RAWP, dated September 3, 2021, which the DEC has approved.  (*See* August 2021 Consent Order; Lefkowitz Decl., Exh. C1 and C2 (the "RAWP"); Exh. K (subsequent emails with the DEC).) The August 2021 Consent Order incorporates an approved-upon RAWP, and indicates that "[Defendant] shall implement and complete the Workplan as approved. If [Defendant] is unable to or fails to complete the Cleanup, the Department shall undertake any remaining work for the cleanup under the spills program." (August 2021 Consent Order at I.2.)  The August 2021 Consent Order also states that "[Defendant] shall use 'best effort' to obtain all Site access, permits, easements, rights-of-way, rights-of-entry, approvals; institutional controls, or authorizations necessary to perform the obligations under this Order."  (August 2021 Consent Order, at V.)  Lastly, the August 2021 Consent Order imposes a $50,000 penalty against Defendant.  (*Id.* at IV.)

The RAWP, dated September 3, 2021, provides a work plan with respect to remediation at the Service Station and the WPHA property (the "WPHA Site").  The RAWP was developed by Defendant's environmental consultant and expert, William Canavan from HydroEnvironmental Solutions, Inc and considers findings and recommendations from Defendant's experts as well as WPHA's environmental consultant, First Environmental, Inc.   The RAWP states that "highest concentrations [of contamination] is located on the Service Station site in an area approximately 70-feet wide by 70-feet long by 8-to-10 feet deep." (RAWP at 3.)  With respect to the WPHA property, the RAWP states that "[t]esting over the past six years has shown that the gasoline spill at the [Service Station] Site has minimally impacted an approximate 3,479-square-foot area on the

neighboring WPHA Property." *Id*. at 4.  The RAWP also discusses the ways in which the recommendations of WPHA's environmental consultant, First Environmental, Inc., purportedly exceed what is necessary to deal with impacted areas.  *See, e.g., id*. at 3 ("The proposed soil excavation area comprises about 1,000 tons, and is depicted by the light-blue polygon on Figure 2 attached, but stands in contrast to the area shown in red hatch—depicting First Environment's proposed excavation area. First Environment claims this red area, totaling 5,400 square feet, must be completely excavated, even though there are few samples from within this area, and those that were taken just outside the area are within Department exceedance standards."); *id*. at 5 ("First Environment's proposed impact area is excessive by another measure. It proposes excavation of the entire red-hatched area based on projections of movement of the plume, without any consideration of natural attenuation or conditions that will result from removal of the primary source on the [Service Station site], and partial excavation on the WPHA Property . . . .").

The RAWP presents two remediation options, with Option 1 being the DEC's current approved plan.  (*See* RAWP at 6; *see also* ECF No. 199 ("Desmond Aff.") at Ex. A. (September 1, 2022 DEC email stating that the RAWP's option 1 is the approved current plan").)  Option 1 proposes de-watering and mass excavation of the Service Station site, which includes the following:

> "excavate, remove, and dispose of approximately 3,000 tons of soil in the source area. This area totals approximately 70 feet wide by 70 feet long by 8-to-10 feet deep.  This is the area where free-phase gasoline and elevated concentrations of BTEX compounds were detected in both the soil and the groundwater. It is also the area immediately upgradient of the WPHA Property, and the source of migrating dissolved gasoline constituents in groundwater. The underground storage tanks on-site have been out of service for greater than 12 months and will be removed.

Excavation on the site will continue until all soil exhibiting petroleum impacts are removed."

(RAWP at 6.)

With respect to the WPHA Property, Option 1 will require Off-Site Soil Excavation which is "guided by the premise that there are relatively lower levels of contaminants, and that the BTEX and MTBE [which are certain types of gasoline constituent] plume is naturally attenuating." (RAWP at 7.)  In addition, "[t]he remediated portion of the WPHA Property would also include non-residential restrictive use. Thus, the RAWP proposes "excavating soil moving from the [Service Station] excavation area towards and onto the WPHA Property up to roughly 10 to 20 feet of monitoring well MW-201, at a depth of 8 to 10 feet." (*Id*.)  Moreover, Option 1 proposes that "post-excavation end-point soil samples will be collected, as required, from the bottom and sidewalls of the proposed off-site excavation, and will be analyzed for VOCs at a NYS certified laboratory to include EPA Method 8270 and be compared to CP-51[3] soil guidance values." (*Id*.) In addition, "[t]he end-point soil results will be compared to NYSDEC Commercial Use Soil Cleanup Objectives (SCOs) to determine the excavation terminus. The end-point sampling results will be used to determine if the extent of the excavation must be altered to include excavation and removal of additional gasoline impacted soil." (*Id*.)  Option 1 also provides for groundwater monitoring and sampling program on the WPHA property, "with quarterly sampling for a period post-remediation to be determined and acceptable to the Department."  Lastly, the RAWP states, in contradiction to the statements made by WPHRA's environmental consultant, that "[d]ue to the aforementioned levels on the WPHA Property, vapor intrusion should not be an issue, especially considering Building 33's distance from the impacted Site."  (*Id*. at 8.) *Compare White Plains*

---

[3]       CP-51 is a policy that provides the framework and procedures for the selection of soil cleanup levels appropriate for remedial programs handled by the DEC.  *See* https://www.dec.ny.gov/docs/remediation_hudson_pdf/cpsoil.pdf .

*Hous. Auth.*, 482 F. Supp. 3d at 113 (Plaintiff's expert indicating that "approximately 6.6 years, the plume from the Service Station will reach Building 33 at concentrations that will cause vapor intrusion to tenants").

Option 2 was created as an alternative plan which anticipated the creation of a parking garage by White Plains Urban Renewal Agency ("WPURA"), which was in the process of purchasing the Service Station property. "This second option helps to streamline the first option and dovetail it with this plan and may be utilized if this occurs under separate institutional controls such as a supplemental order with the WPURA if this purchase occurs." (RAWP at 6.) The Court notes that the Service Station was ultimately not bought by the WPURA—instead, the Court has been informed that the site was purchased by White Plains Hospital and subsequently assigned to 34 EPR, LLC. (*See* ECF No. 225.) WPHA states in its Opposition to Defendant's cross-motion that, "[r]ealistically, Option 2 will not be implemented as the City is no longer pursuing the purchase or condemnation of the [Service Station] property." (*See* ECF No. 198 at 12.). Defendant, on the other hand, indicates that White Plains Hospital might build a parking garage. (*See* ECF No. 194 ("Def's Br.") at 21.).

In any event, with respect to the Service Station, Option 2 proposes that "the entire [Service Station site] will be excavated, and the impacted soil in question will be removed to 14 to 15 [feet below ground]. There will also be well monitoring with quarterly testing, as well as a sub slab depressurization system and vapor barrier." (RAWP at 6.) Regarding the WPHA property, there will be excavation of around 3,300 tons of soil, and "post-excavation end-point soil samples will be collected, as required, from the bottom and sidewalls of the proposed off-site excavation and will be analyzed for VOCs at a NYS certified laboratory to include EPA Method 8270 and be

compared to CP-51 soil guidance values."  In addition, Option 2 contemplates groundwater monitoring and sampling of the WPHA site.  (*See* RAWP at 9.)

On July 12, 2021, the parties were granted leave to engage in the instant motion practice, with Plaintiff seeking to file a motion to preclude purportedly unauthenticated documents and expert testimony regarding those documents, and Defendant filing a cross-motion to dismiss, a motion to stay in the alternative.  Briefing was complete as of April 29, 2022.

## DISCUSSION

Defendant moved to dismiss or in the alternative to stay Plaintiff's RCRA citizen suit, which seeks injunctive relief in the form of remediation, based on two grounds: (i) that the litigation is purportedly precluded under 42 U.S.C. § 6972(b), which bars RCRA citizen suits where the state agency has commenced and is diligently prosecuting an action under subsection (a)(1)(B); and (ii) that the case should be dismissed or stayed under the doctrine of primary jurisdiction given that NYDEC has already issued the August 2021 Consent Order and that remedial efforts are already underway pursuant to an agreed-upon work plan (the "RAWP").  For the reasons discussed below, the Court DENIES Defendant's request to dismiss, or in the alternative, to stay Plaintiff's request for injunctive relief under the RCRA.

In addition, while trial is yet be scheduled for this matter, Plaintiff sought and was granted leave to file a motion to preclude. Specifically, Plaintiff seeks to preclude two drawings of the parking garage plans, which are referenced in Mr. Canavan's (Defendant's environmental expert) Expert Report dated March 26, 2021, as well as Mr. Canavan's testimony and the RAWP to the extent that they reference those drawings.  (*See* ECF No. 191 at 10.)  Plaintiff argues that these drawings are "are undated, and do not indicate who authored them, for whom they were prepared, or for what purpose. The drawings are not signed and/or sealed by a licensed engineer (or anyone

else)." (*Id.*)  For the reasons discussed below, the Court RESERVES JUDGMENT on Plaintiff's motion to preclude.

I.   **Dismissal or Stay Under 42 U.S.C. § 6972(b)**

First, Defendant seeks to stay or dismiss this suit because it argues that "the express provisions of RCRA [under 42 U.S.C. § 6972(b)] explicitly preclude the lawsuit."  (Def's Br." at 10.)  The Court disagrees with Defendant's position.

Section 6972(a) of the RCRA provides a private right of action (also known as "citizen suit"):

> [A]ny person may commence a civil action on his behalf ... against any person ... including any past or present generator ... or past or present owner or operator of a treatment ... facility, who has contributed or who is contributing to the past or present handling, storage, treatment ... or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment....

42 U.S.C. § 6972(a)(1)(B). "The language of this section of the RCRA is expansive, and is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes.'" *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 67 F.Supp.2d 302, 310 (S.D.N.Y.1999) (quoting *United States v. Price*, 688 F.2d 204, 214 (3d Cir.1982)).

However, there are certain carve-outs precluding RCRA citizen suits. *See* 42 U.S.C. § 6972(b).  Specifically, 42 U.S.C. § 6972(b)(2)(C)(i) states that: "[n]o action may be commenced . . . if the State . . . has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section."  42 U.S.C. § 6972(b)(2)(C)(i).  It is well-settled that "state administrative actions simply do not constitute 'actions,' as contemplated in Subsection 6972(b)(2)(C)(i) of the RCRA." *White Plains Hous. Auth. v. Getty Properties Corp.*, No. 13-CV-6282 NSR, 2014 WL 7183991, at *11 (S.D.N.Y. Dec. 16, 2014); *Kara Holding Corp.*, 67 F.Supp.2d at 307 (collecting authorities).

9

Instead, *"(b)(2)(C)(i)* only prohibits (a)(1)(B) claims where a state has brought an action in court." *Orange Env't, Inc. v. Cnty. Of Orange*, 860 F.Supp. 1003, 1024 (S.D.N.Y.1994).

Defendant argues that because the DEC has prosecuted an enforcement action against it, Plaintiff's RCRA suit is therefore precluded.  (*See* "Def's Br." at 11–12.)  However, the DEC enforcement action was a state *administrative* proceeding, and neither party purports nor does the record reflect that the DEC pursued action in any state or federal court. Therefore, Defendant's argument clearly fails, and Plaintiff's suit is not precluded under 42 U.S.C. § 6972(b).[4] [5]

## II.    Dismissal or Stay Under the Doctrine of Primary Jurisdiction

Defendant argues that even without the express provision in the RCRA barring citizen suits, the doctrine of primary jurisdiction precludes the Court from interceding in the DEC's jurisdiction.  (*See* Def's Br. at 10.)  Defendant claims that Plaintiff's injunction claim has "complete overlap" with the now completed DEC enforcement action.  (*Id*. at 14.)  Defendant also raises the specter of potentially conflicting orders or oversight in connection with the Consent Order and RAWP.  (*Id*.)

"Primary jurisdiction is a judicially-created prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *In re Methyl Tertiary Butyl Ether*

---

[4]       The parties also present arguments regarding whether the DEC has "diligently prosecuted" their agency action, which is another requirement that must be shown so that the Court can find that the RCRA citizen suit is barred under 42 U.S.C. § 6972(b).  However, because the Court finds no statutory bar to the RCRA citizen suit because there was no state or federal action in court, the Court need not consider these arguments.

[5]        In its Reply brief, Defendant attempts to distinguish *White Plains Hous. Auth. v. Getty Properties Corp.*, No. 13-CV-6282 NSR, 2014 WL 7183991, at *11 (S.D.N.Y. Dec. 16, 2014), where the Court similarly found that the RCRA claim was not precluded under 42 U.S.C. § 6972(b)(2)(C)(i).  Defendant argues that in *Getty*, the DEC had not yet prosecuted an enforcement proceeding, whereas in this case, there has been such proceeding.  (ECF No. 203 ("Def.'s Reply") at 10.)  Defendant's point is inapposite.  The key question is whether DEC has brought action in state or federal court. Because DEC has not done so, Defendant's attempt to invoke preclusion under 42 U.S.C. § 6972(b)(2)(C)(i) fails.

*(MTBE)*, No. 1:00-1898, 2007 WL 700819, at *1 (S.D.N.Y. Mar. 7, 2007).   "The primary jurisdiction doctrine is relatively narrow in scope." *Segedie*, 2015 WL 2168374, at *13 (quotations omitted) (quoting *In re Frito-Lay*, 2013 WL 4647512, at *7).   This doctrine "is concerned with 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)).   Courts generally consider four factors: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *Ellis*, 443 F.3d at 82–83.   Primary jurisdiction is properly applied "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* (quoting *W. Pac. R.R. Co.*, 352 U.S. at 64).   When applicable, "a court defers to the agency for advisory findings and either stays the pending action or dismisses it without prejudice," being careful not to disadvantage either party.   *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996).

Courts in the Second Circuit and in other circuits have been reluctant to apply the primary jurisdiction doctrine and abstain from hearing RCRA citizen suits, reasoning that "Congress clearly signaled that the federal courts have a duty to hear and decide [RCRA citizen suit] claims and carefully limited the deference courts should pay to the expertise of an administrative agency." *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of New York, L.L.C.*, 405 F. Supp. 3d 408, 429–30 (W.D.N.Y. 2019) (citing *DMJ Assocs., L.L.C. v. Capasso*, 228 F. Supp. 2d 223, 229–30 (E.D.N.Y. 2002); *see also Inc. Vill. of Garden City v. Genesco*, Inc., No. 0777CV5244JFBETB, 2009 WL

3081724, at *9 (E.D.N.Y. Sept. 23, 2009) ("Many courts considering abstention and/or dismissal . . . have determined that where Congress has acted to confer jurisdiction, courts should not act to undo it."); *Town of Hempstead v. United States*, No. 16CV3652JFBSIL, 2017 WL 11699273, at *10 (E.D.N.Y. Sept. 18, 2017) ("Courts have been reluctant to dismiss or stay actions that are brought pursuant to statutes in which Congress explicitly confers jurisdiction upon the federal courts.").

While the Second Circuit has yet to rule on whether or not the doctrine of primary jurisdiction can be invoked against RCRA citizen suits, "the Seventh Circuit has held that abstention 'would be an end run around RCRA.  Congress has *specified* the conditions under which the pendency of other proceedings bars suit under RCRA . . . .'"  *DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229 (citing *PMC, Inc. v. Sherwin–Williams Co.*, 151 F.3d 610, 619 (7th Cir.1998) (emphasis in original)).  The First Circuit, relying upon *Sherwin-Williams*, similarly concluded that "[t]o abstain in situations other than those identified in the statute . . . threatens an 'end run around RCRA,' and would substitute [the court's] judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of RCRA."  *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 31 (1st Cir. 2011) (citation omitted) (quoting *Sherwin-Williams Co.*, 151 F.3d at 619).  The Third Circuit, too, has stated that "[t]he comprehensiveness of [a court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.  Here, the enforcement language of § 6972(a)(1)(B) is generous: it says that a district court may, *inter alia*, 'order ... such other action as may be necessary' to remedy a violation of the statute. Nothing in this language precludes, as part of this enforcement authority, measures such as those required by the District Court here . . . ."  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 267–68 (3d Cir.

2005) (internal quotations and citations omitted).   As another example, the Sixth Circuit has ruled that the *Burford*[6] abstention doctrine, which is comparable to the doctrine of primary jurisdiction,[7] "is inappropriate where Congress has already considered which state actions should preclude federal intervention."  *See Kentucky Waterways All. v. Kentucky Utilities Co.*, 905 F.3d 925, 939–40 (6th Cir. 2018), *abrogated on other grounds by Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 206 L. Ed. 2d 640, 140 S. Ct. 1462 (2020).

While most courts are reluctant to invoke the primary jurisdiction doctrine in the RCRA citizen suit context, there are a few instances where district courts have done so, particularly when the state agency is in the midst of managing remediation efforts.  *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1220–21 (S.D.N.Y. 2002) (dismissing RCRA citizen suit seeking injunctive relief where "Plaintiff has identified nothing whatsoever that this Court could order defendant to do to supplement the DEC's efforts."); *Stratford Holding LLC v. Foot Locker Retail. Inc*., No. CIV-12-0772-HE, 2013 WL 5550461, at *5–6 (W.D. Okla. Oct. 8, 2013) (primary jurisdiction precludes a private RCRA injunction action where the agency is meaningfully involved and a consent order is issued); *McCormick v. Halliburton Co*., No. CIV-11-1272, 2012 WL 1119493, at *2–3 (W.D. Okla. Apr. 3, 2012) (finding that the court "should abstain from exercising jurisdiction under the [RCRA] in order to permit the [Oklahoma Department of Environmental Quality] to continue its investigation, supervision, and remediation of the Site without the prospect of conflicting directive from this Court as to how the contamination

---

[6]         Under the *Burford* doctrine, a federal court must decline to interfere with the orders or proceedings of state administrative agencies: (1) if there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) if the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *Fresh Air for the Eastside, Inc*., 405 F. Supp. 3d at 425 (*citing Dittmer v. County of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998)).

[7]         *See Fresh Air for the Eastside, Inc*., 405 F. Supp. 3d at 427.

should be remedied"); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1349–50 (D.N.M. 1995) (declining to exercise jurisdiction over environmental claim, where state agency, which was "far better suited to resolve [the relevant] issues by reason of 'specialization, by insight gained through experience, and by more flexible procedure,'" had undertaken investigation and had entered into stipulated remedial order) (quoting *Far East Conference v. United State*s, 342 U.S. 570, 575, 72 S. Ct. 492, 96 L. Ed. 576 (1952)); *see also Read v. Corning Inc.*, 351 F. Supp. 3d 342, 354 (W.D.N.Y. 2018) (applying the primary jurisdiction doctrine to abstain from hearing Comprehensive Environmental, Response, Compensation and Liability Act (CERCLA) case where, *inter alia*, agency process "has advanced to the point where the DEC has actually approved a specific remedy."); *Collins v. Olin Corp.*, 418 F.Supp.2d 34, 46 (D. Conn. 2006) (invoking the primary jurisdiction doctrine to dismiss CERCLA claim where "[t]his Court is convinced . . . that the terms of the Consent Order sufficiently establish that the plaintiffs' concerns in this case are being addressed by the [state agency].").

Nonetheless, in light of the weight of case law counseling against the application of the primary jurisdiction doctrine in the RCRA citizen suit context, the Court leans on the side of caution and deny Defendant's request to dismiss or stay.  *See DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229 ("Congress clearly intended citizen's suits to be an integral part of the enforcement efforts

for this federal environmental law, supplementing where necessary the actions of state and federal agencies, and offering a judicial forum to avoid undue delay.").

The Court also will consider the primary jurisdiction factors themselves, and notes that factors do not appear to weigh in favor of either abstention or no abstention.

On the first prong, "whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise," the parties do not disagree that the DEC has a greater expertise with respect to investigation, remediation, and monitoring of soil and groundwater pollution.  *See Collins*, 418 F. Supp. 2d at 45 ("These obligations pertain to investigation and remediating any soil and groundwater pollution on certain properties . . . Deciding what remedy is appropriate for varying levels of contamination, and overseeing that remedial effort, is a matter more properly within the technical expertise and experience of the [state agency].").  That being said, other courts have found that the judiciary is also generally capable of assessing and determining RCRA regulations and requirements.  *See, e.g., Town of Hempstead v. United States*, No. 16CV3652JFBSIL, 2017 WL 11699273, at *11 (E.D.N.Y. Sept. 18, 2017) ("Although the need for certain monitoring and response costs is a technical question, when faced with similar requests for relief involving environmental clean-up actions, courts have found that those actions do not exceed their level of knowledge or expertise."); *see also Luckey v. Baxter Healthcare Corp.*, No. 95–CV–509, 1996 WL 242977, at *5 (N.D. Ill. May 9, 1996) (primary jurisdiction not applicable, despite EPA expertise, because "[t]housands of tort cases involving technical issues of product design and safety are decided by courts every year, and the plaintiff's case [is] indistinguishable.... [I]f the

district court believe[s] that it need[s] information from the EPA, it [can] ask the agency to file an amicus brief.").

However, with respect to the second prong, "whether the question at issue is particularly within the agency's discretion," the parties do not dispute that the issue of remediation of groundwater contamination is also one that is well within the DEC's domain and expertise.  Issues regarding how to remediate contamination "has been committed to the DEC's discretion by the New York legislature.  New York E.C.L. § 27-1313 provides that the DEC 'shall be responsible . . . for inactive hazardous waste disposal site remedial programs . . . .'"  *Read*, 351 F. Supp. 3d at 353–54 (citing New York E.C.L. § 27-1313).

Regarding the third prong—whether there exists a substantial danger of inconsistent rulings—this Court is "cognizant of the participation of other agenc[y] in various aspects of remediation and would fashion relief that would take into account the role of the other state agenc[y]."  *In re Methyl Tertiary Butyl Ether (MTBE)*, 2007 WL 700819, at *6; *Francisco Sanchez v. Esso Standard Oil Co*., 572 F.3d 1, 13–14 (1st Cir. 2009)("in the event that the remedies somehow conflict, the parties are free to seek modification of the relevant injunction"); *Chico Serv. Station, Inc*., 633 F.3d at 31–32 ("should the threat of conflict arise, we see no reason why federal court relief could not be structured so as to avoid interference with the [state agency] proceeding").

In its briefing, Plaintiff raises several issues that it sees in the Consent Order and accompanying RAWP.  The gist of what Plaintiff complains about, based on the work of its own expert, is as follows:

> ". . .  require all soil contamination at both the [Service Station] and the adjacent WPHA property should remediated, have only one remedy (whether the garage is built or not) and that the excavation exit sampling should be measured against Residential cleanup criteria, not Commercial Use cleanup criteria. It also believes

that contaminated groundwater at the bottom of the excavation should be pumped and treated."

(ECF No. 191 at 5 n.1.)

In other words, Plaintiff wants (i) more excavation than what is proposed in the RAWP; (ii) that excavation exit sampling be measured against Residential cleanup criteria, not Commercial cleanup criteria; and (iii) greater remediation with respect to groundwater. Plaintiff also takes issue with the fact that the RAWP planned long-term monitoring will be consistent with future *non*-residential use of the WPHA site and the Service Station, which Plaintiff, as a housing authority, deems unacceptable. (Dkt No. 198 at 9.) Plaintiff also contends with the broad discretion DEC gives itself to apply cleanup criteria based on what it determines to be "feasible" and that will "minimize" migration onto adjacent property—in other words, Plaintiff is wary that the DEC can pull back on remediation efforts depending on future obstacles presented. (*See* ECF No. 198 at 7–8.)[8]

Among Plaintiff's concerns, the Court finds the following of Plaintiff's points compelling: (i) that the RAWP does not do enough to address groundwater contamination; and (ii) that the endpoint excavation efforts should be undertaken under Residential rather than Commercial standards. Defendant fails to adequately address both points. (*See generally* Def.'s Reply.) First, Defendant attempts to address the groundwater issue by pointing to the CP-51 (a policy that provides a framework and procedures for several DEC remediation program, including the program applicable here). Defendant highlights that the CP-51 states that site-specific soil cleanup levels

---

[8]   Notably, Plaintiff's concerns are also driven by its contention that "[DEC] is made of people trying to do the best they can with limited resources." (ECF No. 198 at 3.)   In other words, Plaintiff does not trust that the DEC will be able to adequately monitor remediation efforts.  Plaintiff points to remediation efforts at a different station nearby— the Getty Station— and states that the contractor involved in that station closed an excavation and that there was no evidence that the DEC's engineer authorized the closing of that excavation prior to its closing.  (ECF No. 198 at 3.) The Court does not place much weight, if any, on this argument, given that it deems this to be an insufficient reason as to why the federal court should step in on remediation efforts.  In any event, Plaintiff's comments regarding whether DEC will be able to adequately oversee remediation efforts are speculative at best.

are only applied after "groundwater, if contaminated, has been evaluated for appropriate remedial actions consistent with 6 NYCRR 375-1.8(d) . . ." (Lefkowitz Decl., Exh. I, (the "CP-51").) Defendant also points out that New York law requires that "remedial program at a site shall analyze the impact of contamination at a site on the following environmental media: (i) soil; (ii) groundwater . . ." (Def's Reply at 4 (citing 6 N.Y.C.R.R. 375-1.8(a)(3)).  The Court notes that while Defendant certainly shows that the DEC was obliged to consider groundwater contamination and ensure a remedial program that addresses such contamination, this does not address Plaintiff's concern that there should be more remediation regarding groundwater.

Second, regarding Plaintiff's argument that Residential Cleanup criteria should have been used for end-point excavation sampling, Defendant states that DEC represented over email that CP-51 standards would be used, and that those thresholds are "no less demanding" than the Residential standards.  (Def's Br. at 13.) (Lefkowitz Decl. Exhs. I and K (September 1, 2021 email).)  The Court agrees that it is problematic that the RAWP, dated September 3, 2021, still reflects that the Commercial Criteria would be used, and upon review of that criteria, it appears less stringent than the Residential criteria.  (*See* Lefkowitz Decl. Exh. J (Table 375-6.8(b)).

The RCRA allows Plaintiff to seek additional remedy than what is provided by the state to the extent that it addresses an imminent and substantial endangerment.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 476 F. Supp. 2d 275, 281–82 (S.D.N.Y. 2007) ("where there is 'ample room for injunctive relief beyond [the DEC's] efforts,' a court need not defer to the administrative process.  Here, the DEC's remedial measures may not go far enough and there remains 'ample room' for this Court's involvement."); *Lambrinos v. Exxon Mobil Corp.*, No. 1:00-CV-1734, 2004 WL 2202760, at *7 (N.D.N.Y. Sept. 29, 2004) ("DEC has not commenced any precluding court action or remediated to the extent necessary to make the issue of injunctive relief

moot."); *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1220 (S.D.N.Y. 2002) ("in order to obtain injunctive relief, plaintiff would have to identify some action that defendant could be ordered to take that is not already in place thanks to the action of the state agency and that would improve the situation in some way.");  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 267–68 (3d Cir. 2005) ("Depending on the particular characteristics of a given RCRA site, as found by a district court on a case-by-case basis, particular types of injunctive relief may not be circumscribed by arguments as to what an agency might have done . . . Here, the enforcement language of § 6972(a)(1)(B) is generous: it says that a district court may, *inter alia*, "order ... such other action as may be necessary" to remedy a violation of the statute."); *see also In re Methyl Tertiary Butyl Ether (MTBE)*, 2007 WL 700819, at *5 ("the agencies' regulatory decisions and remediation plans are guided at least in part by the availability of resources, such that lack of remedial action by an agency cannot be taken as a decision that no further remediation is necessary.").

It might be that the fact-finder may consider the remediation efforts approved by the DEC as enough to alleviate those concerns and disagrees with Plaintiff's request for more remediation with respect to groundwater and excavation, but if not, Plaintiff would be entitled to additional remediation under the RCRA should it be necessary and in accordance with the RCRA standard. "The RCRA gives the Court broad equitable powers; the statute authorizes the Court "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both." *87th St. Owners Corp.*, 251 F. Supp. 2d at 1219 (citing 42 U.S.C. § 6972(a)).  "Thus, the Court may not only 'restrain' a defendant from doing whatever it is doing with hazardous waste that creates the

environmental danger, but may also order it take any 'action' that 'may be necessary' to abate that danger." *Id*. (citing *Dague v. City of Burlington*, 732 F. Supp. 458, 472 (D.Vt.1989) (ordering closing of landfill)); *Lambrinos v. Exxon Mobil Corp*., No. 1:00-CV-1734, 2004 WL 2202760, at *5 (N.D.N.Y. Sept. 29, 2004) ("The excavation and removal of soil alone or in combination with alternative remediation techniques, sought by plaintiffs falls well within the scope of what the district court may grant under the broad authority conferred under the RCRA.") (citing 42 U.S. § 6972(a)(1)(b) and *Kara*, 67 F.Supp.2d at 310).   Notably, the restraint must be related to an "imminent and substantial endangerment to health or the environment."   *See White Plains Hous. Auth*., 482 F. Supp. 3d at 116.  A finding of imminency "require[s] a showing that actual harm will occur immediately."   *Id*. (citing *Dague*, 935 F.2d at 1356).   An "'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public. *Id*. "For the endangerment to be '"substantial,' there must be 'reasonable cause for concern that someone or something may be exposed to risk of harm if prompt remedial action is not taken.'" *Id*. (citing *Fresh Air for the Eastside*, 405 F. Supp. 3d at 438).

The Court notes that there has already been extensive back and forth that the parties have already engaged in with the DEC, including the thorough work by experts and the DEC's evaluation of expert reports.  The goal of whatever remediation Plaintiff can avail itself under the RCRA is to supplement that already provided by the DEC.  The Court warns that to the extent that Plaintiff seeks to expand remediation efforts for purposes of its future development project, such purpose is not a valid ground to seek an injunction under the RCRA. *See Interfaith Cmty. Org. v.*

*Honeywell Int'l, Inc.*, 399 F.3d 248, 266 (3d Cir. 2005) (implying that it is improper to consider property development interests when finding that an injunction under the RCRA is necessary).

Lastly, the Court considers the fourth factor—whether a prior application to the agency has been made. Here, the DEC has already brought its own agency enforcement action with respect to the contamination, which resulted in the August 2021 Consent Order and the adoption of a work plan. (Def's Br. at 17.) Therefore, this factor would favor a stay, though it is worth noting that the parties have previously entered into a consent order in 2018, which Defendant failed to abide by. *See White Plains Hous. Auth*., 482 F. Supp. 3d at 112. The instant consent order was presented to Defendant in January 17, 2019 but subsequently revised and signed more than two years later, in August 2021. *Id*. at 113. Given the long-span of time it has taken to go through the remediation process, in large part by Defendant's own delays and previous failure to comply with the NYDEC's orders, the Court deems it prudent to maintain jurisdiction in order to ensure that Defendant's RCRA obligations are met.[9]

### III. Plaintiff's Motion to Preclude Parking Garage Plans

Plaintiff seeks to preclude two drawing of the parking garage plans, which are referenced in Mr. Canavan expert report, dated March 26, 2021, as well as Mr. Canavan's testimony to the extent he discusses those drawings and uses them to form his opinion, and statements made in the

---

[9]      Plaintiff heavily relies on *Cnty. of Suffolk v. Long Island Lighting Co*., 907 F.2d 1295, 1308 (2d Cir. 1990), a case brought under the federal racketeering statute, and cites to that case to argue that the "primary jurisdiction doctrine only applies to agencies created by Congress, not state agencies." (*See* ECF No. 198 at 7 (citing *Cnty. of Suffolk,* 907 F.2d at 1310 ("It is our view that the doctrine ordinarily may not be applied where, as here, the claim is brought under federal law and there are no competing federal forums.")). While this proposition has not been explicitly abrogated, it does not appear to have been followed by subsequent decisions. For example, in *Johnson v. Nyack Hospital*, the Second Circuit held that, under the primary-jurisdiction doctrine, the district court should have stayed the plaintiff's federal antitrust claim pending a state administrative agency's determination of the factual issues underlying the Sherman Act claim. 964 F.2d 116, 122–23 (2d Cir.1992); *see also Read v. Corning Inc*., 351 F. Supp. 3d 342, 350 (W.D.N.Y. 2018) (invoking the primary jurisdiction doctrine to dismiss plaintiff's request for relief under CERCLA in favor of the state agency proceedings.).

RAWP to the extent that they rely on the drawings to form a recommendation regarding Option 2. (*See* ECF No. 191 at 10, 14; ECF No 192-6 (Caravan Expert Report); ECF No. 192-7 (depicting the two parking garage plans); the RAWP).[10]   Plaintiff argues that these drawings are "are undated, and do not indicate who authored them, for whom they were prepared, or for what purpose.  The drawings are not signed and/or sealed by a licensed engineer (or anyone else)."  (*Id.*)  Plaintiff argues that "there is no evidentiary basis to assume the drawings are authentic, that the 'conceptual' garage purported be depicted in the drawings will ever be built or if it is, it would be built to the dimensions outlined in those drawings, and Mr. Canavan has had no communication with the City about the drawings."  (ECF No. 191 at 10–11.)

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)).  An *in limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  "[C]ourts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006).  "Because a ruling on a motion in limine is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 09–CR–1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

---

[10]      The Court notes that Plaintiff impermissibly used the opportunity it was given to brief on its motion to preclude to instead, in large part, anticipatorily argue against Defendant's cross-motion to dismiss or stay in the alternative.  (*See* ECF No. 191.)  The Court is within its discretion to disregard the portions of the brief not relevant to Plaintiff's motion to preclude, and warns Plaintiff against engaging in similar conduct in the future.

Plaintiff seeks to preclude these garage plan drawings and related testimony under Fed. R. Evid. R. 402 and 901(a). Under Rule 402 of the Federal Rules of Evidence, relevant evidence is admissible, and irrelevant evidence is not. *See* Fed. R. Evid. 402. In addition, Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence the proponent must produce evidence sufficient to support of a finding that the item is what the proponent claims it is." *See United States v. Hon.,* 904 F.2d 803, 809 (2d Cir. 1990). As a general matter, "a document is properly authenticated if a reasonable juror could find in favor of authenticity." *United States v. Gagliardi,* 506 F.3d 140, 151 (2d Cir. 2007). "The bar for authentication of evidence is not particularly high," *id.*, and "the proponent need not rule out all possibilities inconsistent with authenticity," *United States v. Oreckinto*, 234 F. Supp. 3d 360, 365 (D. Conn. 2017) (citation omitted). In addition, the Second Circuit "[has] stated that the standard for authentication is one of 'reasonable likelihood,' and is 'minimal.' . . . The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard. *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (internal citations and quotations omitted); *see also Scotto v. Brady*, 410 F. App'x 355, 361 (2d Cir. 2010) ("The trial court has broad discretion in determining whether an item of evidence has been properly authenticated, and we review its ruling only for abuse of discretion."

For the foregoing reasons, the Court RESERVES JUDGMENT regarding Plaintiff's request to exclude the two drawings.

The Court finds that the drawings and expert testimony with respect to those drawings are relevant under Fed. R Evid. 402, given that they are among the documents that helped to inform one of the remediation options under the RAWP. The Court, however, reserves judgment on Plaintiff's motion to exclude based on Fed. R. Evid. 901(a). At this time, the Court sees no reason

to preclude the documents, given that Defendant may call in a witness to establish such authentication should this case proceed to trial and should they seek to enter these figures into evidence.  With respect to Plaintiff's desire to exclude portions of the expert report and the RAWP referencing these figures, Plaintiff cites to no rule or case law in support of their request.  Surely, Mr. Caravan can be cross-examined and Plaintiff can poke holes in the expert's recommendation to the extent that he relied on the conceptual drawings.  But there is no basis here to exclude portions of his expert report, or even parts of the RAWP that rely on those portions of the expert report.

**CONCLUSION**

For the foregoing reasons, the Court RESERVES JUDGMENT on Plaintiff's motion to preclude and DENIES Defendant's motion to dismiss, or in the alternative, stay the action.

The Clerk of Court is respectfully directed to terminate the motion at ECF Nos. 193, 197.

Dated: December 19, 2022                             SO ORDERED:
     White Plains, New York


_____
    NELSON S. ROMÁN
  United States District Judge